**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| ARTEZ HAMMONDS, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. 1:05-cv-831-MEF |
| | ) | (WO—Publish) |
| RICHARD ALLEN, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Artez Hammonds was convicted of capital murder in the Circuit Court of Houston County, Alabama. The jury recommended the death penalty, and the trial court agreed, sentencing Hammonds to death. After his case weaved its way through Alabama's state court system, Hammonds decided to petition this Court for a writ of habeas corpus. (Doc. # 6.) Having reviewed the state court record, and after fully considering his claims for relief, Hammonds' habeas petition is due to be denied.

### II. FACTUAL AND PROCEDURAL HISTORY

The Alabama Court of Criminal Appeals summarized the facts of this case on direct appeal:

> The State's evidence tends to show the following. In the spring of 1990, Marilyn Mitchell graduated from the University of Alabama school of nursing and moved to Dothan where she was to begin her nursing career and to marry. Ms. Mitchell was 5 feet, 1 inches tall and she weighed around 110 pounds. Her friends recalled that she was a cautious individual, and that she always kept her apartment

doors locked. She moved into a townhouse in Dothan where she and her fiancé intended to reside after they married later that summer. On May 14, 1990, Artez Hammonds and another individual delivered newly purchased bedroom furniture to Ms. Mitchell's townhouse and placed the furniture in the second floor master bedroom. On the evening of May 15, 1990, Ms. Mitchell's fiancé came to the townhouse and discovered the front door unlocked. He heard water running in the upstairs bathroom and, as he climbed the stairs, he discovered Marilyn Mitchell's blood-soaked body lying in the hallway at the top of the stairs. He telephoned the police. The police investigation revealed that Marilyn Mitchell was apparently in the downstairs kitchen baking a cake when she was attacked. There were no signs of forcible entry. When Ms. Mitchell's body was found at the top of the stairs, she was dressed only in a T-shirt, naked from the waist down, and she was lying on her back in a large pool of blood; her legs were spread wide apart. Forensic reports indicated that Ms. Mitchell has been repeatedly stabbed and cut with a knife in the neck and chest. The wounds to the neck perforated her jugular veins and carotid artery and caused massive bleeding. There were over 30 lacerations to the neck area, including a wound that severed the voice box. There was also evidence of ligature strangulation, possibly from Ms. Mitchell's T-shirt, which had been used to restrain her. In the opinion of the medical examiner, all of these wounds were inflicted while Ms. Mitchell was still alive. There were two extremely violent stab wounds to the chest area, one of which penetrated Ms. Mitchell's sternum and punctured her aorta. Another vicious stab wound to the chest actually cut through three ribs. The medical examiner opined that the stab wound that punctured the aorta was the wound that finally killed Ms. Mitchell. Swabs taken from Ms. Mitchell's vaginal and anal cavities indicated the presence of spermatozoa, although there was no evidence of anal penetration. Semen was also found on a paper tissue found in a bedroom next to a bed; the comforter on the bed was missing. Blood spatters were also found in the home. Evidence indicates that the attacker may have cleaned up after the attack, positioned the body, smoked a cigarette, and then flicked ashes on Ms. Mitchell's body. In addition to the comforter, Ms. Mitchell's engagement ring and approximately $400 were also apparently taken from the townhouse.

> The police investigation continued for many years without success until, in 1996, the Alabama Department of Forensic Sciences conducted DNA testing on the semen samples recovered at the crime scene and discovered that the genetic characteristics of the tested samples were more likely to be found among black males than white males. This new information led police investigators back to the furniture delivery men. Police discovered that Artez Hammonds had been convicted for the attempted murder of another woman and that he was serving a 20-year sentence at Holman Prison. Because Hammonds was a convicted felon incarcerated in an Alabama penitentiary, a sample of his blood was drawn, pursuant to the Alabama combined DNA indexing system ("CODIS") program (see § 36-18-20, Ala. Code 1975, et seq.), and the sample was sent to the Alabama Department of Forensic Sciences for DNA analysis and comparison. The forensic scientists who conducted the DNA analysis testified that the DNA taken from Hammonds's blood sample matched the DNA contained in the semen found on the paper tissue, the spermatozoa found on the vaginal and anal swabs, and the blood stains located on the inside of the door and baseboard of Ms. Mitchell's home.

> Additionally, Hammonds's thumbprint was found on the telephone in the victim's bedroom. Testimony also revealed that after the murder Hammonds had in his possession a diamond ring similar in appearance to Ms. Mitchell's engagement ring; he later pawned the ring.

*Hammonds v. State*, 777 So. 2d 750, 754–55 (Ala. Crim. App. 1999).

The State of Alabama tried Hammonds in the fall of 1997. After a ten-day trial, a jury found Hammonds guilty of intentional murder during a rape, a capital offense under Alabama law. *See* Ala. Code § 13A-5-40(a)(3). The jury recommended the death penalty. The state trial judge agreed, sentencing Hammonds' to death on December 19, 1997.

Hammonds then began the process of appealing his conviction and sentence. His first appeal proved unsuccessful: the Alabama Court of Criminal Appeals affirmed his

conviction and sentence in August of 1999 and denied rehearing in October of the same year. *See Hammonds v. State*, 777 So. 2d 750 (Ala. Crim. App. 1999). Hammonds' appeal to the Alabama Supreme Court proved similarly unfruitful as the court affirmed the court of appeals and denied rehearing. *See Ex parte Hammonds*, 777 So. 2d 777 (Ala. 2000). The Supreme Court of the United States likewise declined to grant Hammonds relief, denying his petition for a writ of certiorari in early 2001. *See Hammonds v. Alabama*, 532 U.S. 907 (2001).

Hammonds next filed a Rule 32 petition for relief from judgment and sentence in the Circuit Court of Houston County, Alabama. After he amended his petition twice— once on July 11, 2002, and again on August 2 of the same year—the circuit court conducted an evidentiary hearing. And a little over a month later, the circuit court denied Hammonds' petition. The Alabama Court of Criminal Appeals then affirmed, *see Hammonds v. State*, 925 So. 2d 1009 (Ala. Crim. App. 2005) (mem.), and denied rehearing, *see Hammonds v. State*, 926 So. 2d 1080 (Ala. Crim. App. 2005) (mem.). After the Alabama Supreme Court denied Hammonds's petition for a writ of certiorari, *see Hammonds v. Alabama*, 946 So. 2d 543 (Ala. 2005), he timely filed a petition for a writ of habeas corpus in this Court (Doc. # 1). He amended his petition less than a month later. (Doc. # 6.)

### III. STANDARDS OF REVIEW

#### A. Substantive standard

The writ of habeas corpus allows a federal district court to order the release of a prisoner held in custody in violation of the Constitution, laws, and treaties of the United

States. *See* 28 U.S.C. §§ 2241–2255. Hammonds brings his claim under § 2254(a), the statutory provision giving this Court jurisdiction to review state court criminal proceedings for both constitutional and non-constitutional violations. Section 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides the substantive standard governing habeas review of Hammonds' state court criminal proceedings:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

And the United States Court of Appeals for the Eleventh Circuit has elaborated on the standard of review as follows:

> A federal court may not grant habeas relief unless the decision of the state court either was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).
>
> Our review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall

have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e).

Our review of legal conclusions by the state courts is also especially deferential. A state court decision is contrary to the clearly established precedent of the Supreme Court "(1) if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent." *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 406 (2000)). An unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies the rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).

Under the unreasonable application clause of section 2254(d), a federal habeas court may not issue the writ on the ground that, in its independent judgment, the state court applied federal law incorrectly. *See Bell v. Cone*, 535 U.S. 685, 698–99 (2002). This clause imposes a "'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). The habeas applicant must show that the state court applied federal law to the facts of his case in an objectively unreasonable manner. *See id.* at 25. An "unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410.  Even clear error, standing alone, is not a ground for awarding habeas relief. *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

*Stephens v. Hall*, 407 F.3d 1195, 1201–02 (11th Cir. 2005) (citations omitted).

A district court must resolve all claims for relief raised in a petition for a writ of

habeas corpus, no matter whether habeas relief is granted or denied. *See Clisby v. Jones*,

960 F.2d 925, 936 (11th Cir. 1992). What this means is that this Court must address each and every one of Hammonds' claims and sub-claims, make a decision on each, and provide reasoning for that decision. The Court must also deem any allegation of a constitutional violation as a claim for relief. *See id.*

### B. Procedural standards

### 1. Exhaustion requirements

A state prisoner must exhaust the remedies available to him in state court before petitioning for habeas relief in federal court. 28 U.S.C. § 2254(b)(1)(A). "This rule of comity reduces friction between the state and federal court systems by avoiding the 'unseemliness' of a federal district court's overturning a state-court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *Woodford v. Ngo*, 581 U.S. 81, 92 (2006). To provide the state courts with the necessary full and fair opportunity to address his claim, "the petitioner [must] 'fairly present' his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right." *Duncan v. Thomas*, 513 U.S. 364, 365–66 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).

To this end, the petitioner must alert each appropriate state court "to the federal nature of the claim and a statement of the facts which entitle him to relief." *Duncan*, 513 U.S. at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard*, 404 U.S. 277–78. More specifically, for exhaustion purposes, "a claim for relief . . . must include references to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). In

other words, the state courts must have had the "opportunity to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim." *Picard*, 404 U.S. at 277.

A petitioner has exhausted state-court remedies when he no longer has those remedies available to him, no matter the reason for their unavailability. *Id.* at 92–93. "Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted." *Id.* at 93. But exhaustion in this sense does not entitle the petitioner to litigate his claim in federal court; to the contrary, federal courts consider such claims procedurally defaulted. *Id.*; *McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) ("It is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar."); *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1998) ("[F]ederal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile.").

Rule 32.2(b) of the Alabama Rules of Criminal Procedure imposes further exhaustion requirements. Rule 32.2(b) provides that courts shall not entertain successive habeas petitions unless the petitioner can show cause why the newly raised grounds "could not have been ascertained through reasonable diligence when the first petition was heard." Ala. R. Crim. P. 32.2(b). If a petitioner has failed to exhaust his claim and cannot meet the Rule 32.2(b) standard, the federal habeas court should consider those claims

procedurally defaulted. *See Woodford*, 548 U.S. at 93.

## 2. The procedural default doctrine

The procedural default rule bars a federal court from reaching the merits of a claim on collateral review when the habeas petitioner failed to follow a state's procedural rules while presenting his federal claim in state court. *Wainwright v. Sykes*, 433 U.S. 72, 82 (1977). "Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar . . . and that bar provides an adequate and independent state ground for denying relief." *Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991) (en banc) (citations omitted). But there is a safety valve for procedurally defaulted claim: federal district courts may consider them on the merits if the petitioner can show either (1) cause for the procedural default and actual prejudice arising out of the violation of federal law, *Wainwright*, 433 U.S. at 87, or (2) a resulting fundamental miscarriage of justice if the court does not consider the claims, *Schlup v. Delo*, 513 U.S. 298 (1995).

To demonstrate cause for a procedural default, the petitioner must show that "some objective factor external to the defense impeded counsel's effort to comply with the state's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A cause suffices if it is an "objective impediment[] to compliance with a procedural rule" so that "a showing that the factual or legal basis for a claim was not reasonably available to counsel" or "some interference by officials . . . made compliance impracticable." *Id.* at 488 (internal quotations and citations omitted). Constitutionally ineffective assistance of counsel, for example, can amount to a valid cause for noncompliance. *Hollis v. Davis*,

941 F.2d 1471, 1476 (11th Cir. 1991).

If the petitioner can show cause, he must also show actual prejudice stemming from the alleged constitutional violation. *Alexander v. Dugger*, 841 F.2d 371, 374 (11th Cir. 1988). Establishing actual prejudice requires a petitioner to show "not merely that errors in his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). "A mere possibility of actual prejudice resulting from an error at trial will not waive the procedural default where other substantial evidence of guilt is present." *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992). Importantly, "[b]ecause there is no constitutional right to an attorney in state postconviction proceedings . . . a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings . . . ." *Coleman v. Thompson*, 501 U.S. 722, 725 (1991) (internal citations omitted).

Furthermore, a federal court can review a habeas claim on the merits to correct a "fundamental miscarriage of justice." *Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996). This requires the petitioner to "show by clear and convicing evidence that but for a constitutional error, no reasonable juror would have found the petitioner [guilty] under the applicable law." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).

## IV. DISCUSSION

Before analyzing Hammonds' claims on the merits, the Court will first resolve

whether certain claims are unexhausted or procedurally defaulted.[1] As a threshold matter, the parties disagree about how the Court should address these arguments, especially as to Hammonds' claim of ineffective assistance of counsel. (*See* Doc. # 6 at ¶¶ 39–92.) The ineffective assistance claim (Claim B in the petition) spans 53 paragraphs and contains 25 separate subsections. (*Id.*) The State contends that each subsection amounts to a separate claim regarding whether Hammonds was denied effective assistance. This would mean that each argument advanced by Hammonds would have to satisfy AEDPA's exhaustion and procedural default requirements independently.[2] Conversely, Hammonds contends that "Claim B is one claim that contains several examples and instances of ineffective assistance of counsel," and that the Court should evaluate the claim by considering the cumulative effect of the deficiencies alleged. (Docs. # 5, 47.) According to Hammonds, the exhaustion doctrine does not preclude consideration claims supported by different factual bases than those presented to the state court unless the claim is "fundamentally" altered by the change in the factual predicate. *See Vazquez v. Hillery*, 474 U.S. 254, 260 (1986).

---

[1] As discussed above, Rule 32.3(c) would bar any claim that Hammonds failed to exhaust at the state level. So the Court will treat unexhausted claims as procedurally defaulted. Here, the parties do not make much of the distinction between claims procedurally barred because of a failure to exhaust and claims the state courts declared procedurally barred under Rule 32(a)(1)–(5) of the Alabama Rules of Criminal Procedure. Accordingly, the Court will not spend much time distinguishing between these doctrines either.

[2] The State actually goes beyond Hammonds' own labeling and finds that certain claims not only have subclaims but also sub-subclaims. The State reads the petition like this: Claim B – Ineffective assistance of counsel; Claim B(i) – Ineffective assistance of counsel for failure to follow credible leads pointing to two likely suspects; Claim B(i)(a) – Ineffective assistance of counsel for failure to investigate reports that a man incarcerated in California confessed to Hammonds' crime. Put simply, the State considers each factual allegations in Hammonds' petition to amount to an individual claim for relief.

The Eleventh Circuit has addressed this very issue. In *Kelley v. Secretary for the Department of Corrections*, the court of appeals described the petitioner's obligation to raise the factual bases for his claims and the consequences for failing to do so:

> . . . the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief. For example, habeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts. *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir. 1992). As we explained,
>
>> allowing a habeas petitioner to allege a single instance of ineffective assistance in his state post conviction proceedings and then proceed to federal court to allege additional instances would be contrary to the state's "full and fair opportunity to address the claim on the merits." The state would never have the benefit of evaluating the claim using a fully developed set of facts. This would not be the "serious and meaningful" exhaustion of claims that Congress intended.
>
> *Id.* . . . . Furthermore, habeas petitioners cannot preserve otherwise unexhausted, specific claims of ineffective assistance merely by arguing that their lawyers were ineffective in a general and unspecified way. *See Weeks*, 26 F.3d at 1044–46 (rejecting petitioner's argument that "the general claim of ineffective assistance in state court preserves for federal review all alleged instances of ineffectiveness, regardless of whether evidence of a particular act was presented to the state court"). In sum, to preserve a claim of ineffective assistance of counsel for federal review, the habeas petitioner must assert this theory of relief and transparently present the state courts with the specific acts or omissions of his lawyers that resulted in prejudice.

377 F.3d 1317, 1344 (11th Cir. 2004).

The Court will analyze the disputed claims using the rule set forth in *Kelley*. Specifically, the Court will examine whether Hammonds asserted before the state courts each theory of relief and transparently presented the courts with specific acts or omissions by his lawyers that resulted in the claimed prejudice. If a given act or omission never came before the state courts for review, the Court will not consider it properly preserved for federal review and will not consider it when discussing the merits of Hammonds' ineffective assistance claim.[3]

After addressing the exhaustion and procedural default arguments, the Court will take up the State's contention that some of Hammonds' claims should be dismissed for failing to comply with the pleading standards set forth in Habeas Corpus Rule 2(c). The State claims that 21 of Hammonds' allegations "are merely conclusory in nature, and often merely lists of allegations." (Doc. # 68 at 51.) After disposing of unexhausted or procedurally defaulted claims, the Court will analyze whether any of Hammonds' remaining claims are due to be dismissed as conclusory.

Next, the Court will analyze the State's argument that Hammonds has abandoned several claims. According to the State, Hammonds abandoned a number of claims and, thus, the Court should refrain from adjudicating them on the merits. After resolving this dispute, the Court will turn to whether Hammonds is entitled to an evidentiary hearing for

---

[3] Hammonds cites *Terry Williams v. Taylor*, 529 U.S. 362, 399 (2000), to argue that his ineffective assistance claim should receive cumulative treatment when analyzing the parties' exhaustion and procedural default arguments. He further contends that any additional factual allegations supporting his ineffective assistance claim do not "fundamentally alter the legal claims" and therefore should not be considered procedurally defaulted. But the Eleventh Circuit rejected a nearly identical argument in *Kelley*, finding that adding new factual bases for counsel's claimed ineffectiveness would "fundamentally alter" the petitioner's claims. 377 F.3d at 1350.

13

any remaining claims for which he requests a hearing. Finally, the Court will address any claims ripe for consideration without an evidentiary hearing, adjudicating those claims on the merits in this Memorandum Opinion and Order.

### A. Unexhausted and procedurally defaulted claims

### 1. Hammonds' claim of ineffective assistance of counsel (Claim B)

As the Court discussed above, each factual allegation supporting Hammonds' ineffective assistance claim will receive independent consideration per the rule set out in *Kelley v. Secretary for Department of Corrections*. The State contends that Hammonds has failed to exhaust his remedies on a number of his claims, which, it argues, means they are procedurally defaulted. A petitioner fails to exhaust a claim if he did not present it during a full round of appellate review, which includes either on direct appeal or on collateral attack of the conviction. The record makes clear that Hammonds never presented his ineffective assistance claim on direct appeal, perhaps because trial counsel also represented him during the direct appeal proceedings. Accordingly, the Court will only address whether Hammonds adequately raised in his Rule 32 petition each of the ineffectiveness claims now before the Court.

### a. Claim B(1)(b): Failure to follow credible lead of victim's high school classmate

Hammonds claims he was denied the effective assistance of counsel because trial counsel failed to follow up on several leads. One lead involved a possible suspect who attended high school with the victim and her fiancé. The potential suspect allegedly told the police that they had the "wrong man" in Hammonds' case and that he had personally cut a woman's throat before. According to Hammonds, trial counsel should have

followed this lead because doing so would have led to "the actual perpetrator(s)" of the crime. (Doc. # 6 at ¶¶ 40–44.)

The State claims that because Hammonds failed to present this argument to the state courts, it is unexhausted and thus procedurally defaulted. Hammonds disagrees, contending that because he presented his generalized ineffective assistance argument during the Rule 32 proceedings, the claim is not procedurally defaulted.

The Court has reviewed the record thoroughly and can find no mention of trial counsel's failure to investigate leads in either Hammonds' Amended Rule 32 Petition or his Second Amended Rule 32 Petition. But the trial court, in its Rule 32 Order, mentions that Hammonds raised counsel's alleged failure to investigate leads during the evidentiary hearing held on August 2, 2002. (Vol. 51, R. 82, at 745 (finding "assertions were made at the evidentiary hearing," including "that the attorneys failed to follow up on particular leads.").) The transcript does not, however, make mention of a man that attended high school with either the victim or her fiancé. As a result, the Court must find that Hammonds did not properly raise the claim below, thereby precluding consideration of this allegation in the cumulative analysis of Hammonds' ineffectiveness claim.

### b. Claim B(2)(b): Failure to investigate Hammonds' juvenile record and pursue youthful offender status

Hammonds argues for trial counsel's ineffectiveness next by asserting that counsel failed to pursue youthful offender status for him adequately. (Doc. # 6 at ¶¶ 45–50.) Hammonds notes that while his attorneys filed an application for youthful offender status, they were so unfamiliar with his juvenile record that he could not properly contest the

State's arguments about the youthful offender petition. From there Hammonds explains why, had the trial court known certain facts about his juvenile record, the court would have likely granted his youthful offender petition. And if the court had granted the motion, Hammonds would have been ineligible for the death penalty.[4] The State argues Hammonds defaulted on this claim because he failed to raise it in the Rule 32 proceeding.

The State is incorrect. Hammonds' Rule 32 motion asserts that trial counsel acted ineffectively by failing to pursue youthful offender status adequately. (Vol. 42, R. 66, at 470.) The trial court denied this claim on the merits and the Alabama Court of Criminal Appeals upheld the denial. (Vol. 51, R. 83, at 29.) This Court can therefore review the claim on the merits: Hammonds properly raised it in state court and the state courts issued a substantive ruling.

### c. Claim B(3)(d): Failure to identify and interview Tim Pridget, a potential alibi witness

Hammonds argues that trial counsel was ineffective because of their failure to interview Tim Pridgen, the manager of the furniture store where Hammonds worked at the time of Mitchell's murder. According to Hammonds, he was at work when the murder occurred, and counsel could have established this alibi by interviewing Pridgen. (Doc. # 6 at ¶ 55.) The State contends that Hammonds did not raise this issue in his Rule 32 proceeding, which means the claim is defaulted.

---

[4] The State argues that Hammonds' claim about counsel's failure to pursue youthful offender status is distinct from his claim that counsel failed to investigate his juvenile record. The State is attempting to split hairs here. Hammonds' claims about his alleged youthful offender status and trial counsel's failure to become familiar with it are so inextricably linked that it would make little sense to treat them as separate claims as the State would have the Court do.

The State is correct to note that Hammonds' Rule 32 motion does not mention Pridgen. It does state, however, that "counsel failed to locate and interview witnesses who could corroborate Hammonds' alibi (Mr. Hammonds was at work at the time that Ms. Mitchell was killed)." (Vol. 40, R. 62, at 32.) Although Hammonds lays out his claim in more detail in his federal habeas petition than in his Rule 32 petition, the latter still meets the level of specificity required by *Kelley*. Indeed, Hammonds sufficiently pointed out to the state courts the specific acts or omissions of trial counsel that he claims amounted to ineffective assistance of counsel. Accordingly, the Court finds that Hammonds properly raised his ineffective assistance claim as it relates to trial counsel's failure to interview Pridgen. Hence, the Court will consider the claim in the cumulative analysis of trial counsel's alleged ineffectiveness.

### d. Claim B(3)(d): Failure to identify and interview Greg Gordon as a potential alibi witness

Similar to his claim related to Pridgen, Hammonds argues that his trial counsel was ineffective for failing to interview Greg Gordon, Hammonds' co-worker at the furniture store. (Doc. # 6 at ¶ 56.) Also like his Pridgen claim, Hammonds contends that Gordon would have corroborated Hammonds' alibi—that he was working at the furniture store when Mitchell's murder took place—but that trial counsel failed to get a statement from Gordon. The State again argues that Hammonds defaulted on this claim by failing to mention Gordon by name in his Rule 32 motion.

Hammonds' Rule 32 motion states that "counsel failed to locate and interview witnesses who could corroborate Mr. Hammonds's alibi (Mr. Hammonds was at work at

the time that Ms. Mitchell was killed)." (Vol. 40, R. 62, at 32.) Like with Pridgen, this is

sufficiently specific to meet the *Kelley* test: Hammonds pointed out the specific acts or

omissions of trial counsel that he thinks constituted ineffective assistance of counsel.

Therefore, the Court finds he properly raised the claim below and will consider the

allegation during the cumulative analysis of trial counsel's alleged ineffectiveness.

### e. Claim B(3)(g): Failure to interview Valerie Rivers

In his petition, Hammonds argues that trial counsel did not assist him effectively

by failing to interview Valerie Rivers, Hammonds' sister-in-law. (Doc. # 6 at ¶ 58.)

Rivers testified at trial that she had seen Hammonds with a diamond ring like the one

taken from the victim's hand. Hammonds now claims that had trial counsel investigated

Rivers' story by interviewing her they would have discovered a significant amount of

evidence with which to impeach her testimony. The State asserts that this claim is

defaulted because Hammonds did not raise it in his Rule 32 proceeding. (Doc. # 68 at 6.)

Hammonds' Rule 32 motion argues that trial counsel failed to assist him

effectively by failing to object to the admissibility of Rivers' testimony at trial. But it

makes no mention of counsel's ostensible failure to interview her. (Vol. 40, R. 62, at 46–

47.) Nor does Hammonds' Rule 32 allegations about counsel's "failure to locate and

interview" alibi witnesses save this newly asserted claim—Rivers was not in fact a

potential alibi witness. Hammonds' Rule 32 petition therefore did not encompass the

failure to interview Rivers. The Court accordingly finds that Hammonds' allegation about

counsel's failure to interview Rivers is procedurally barred because he never presented

the underlying facts and assertions to a state court. As a result, the Court will not consider

these allegations when reviewing the cumulative evidence of trial counsel's ineffective assistance.

### f. Claim B(5)(b): Failure to challenge the State's expert witnesses' qualifications to give opinion testimony

Hammonds next asserts that trial counsel's failure to challenge the qualifications of the State's expert witness amounts to ineffective assistance. The State argues, however, that Hammonds' Rule 32 motion never raised this claim. During the Rule 32 proceeding, Hammonds argued that his trial lawyers were ineffective for not challenging the conclusions of the State's experts and the methods by which the State's DNA technicians analyzed Hammonds' blood. But the record makes no mention of counsel's failure to question any witness's qualifications to testify as an expert. Consequently, the Court finds that Hammonds did not properly raise this argument below. Per *Kelley*, the Court will not consider these allegations when deciding Hammonds' cumulative ineffective assistance of counsel claim.

### g. Claim B(6)(a): Failure to test physical evidence independently

Claim B(6) of Hammonds habeas petition states that his trial counsel acted ineffectively because he did nothing to challenge "the heart of the State's case—the so-called 'match' between Mr. Hammonds and the' tissue.'" (Doc. # 6 at ¶ 67.) Hammonds also lists the actions that counsel could have taken to challenge the State's DNA evidence, like seeing the State's expert's bench notes and "independently test[ing] the physical evidence." The State takes issue with Hammonds' raising the independent testing argument now, contending that he did not raise it during his Rule 32 proceedings.

After a thorough review of the record, the Court cannot agree with the State's

position. The trial court's denial of Hammonds' Rule 32 petition stated:

> Petitioner's next assertion was that his attorneys failed to
> have DNA tests performed. Mr. Decker testified that
> extensive work was done by the defense concerning DNA. He
> stated that while an independent test was not conducted his
> experts reviewed all information generated by the Alabama
> Crime Lab and FBI.

(Vol. 51, R. 82, at 719). Hammonds raised, and the trial court disposed of, the argument

that trial counsel was deficient for failing to conduct an independent DNA test on the

genetic material found in the victim's apartment. Further, Hammonds' B(6)(a) claim

mirrors claim B(7), which is entitled "Trial Counsel Failed to Seek Independent Forensic

Testing of Physical Evidence." (Doc. # 6 at ¶ 24). In claim B(7), Hammonds argues that

"Counsel was obligated to pursue the testing of, among other things . . . the tissue (or

paper towel) purportedly recovered near the victim's bed." The State does not challenge

claim B(7) on procedural default grounds, even though a portion of B(7) is almost

identical to the challenged claim B(6)(a). For these reasons, the Court finds that

Hammonds' properly raised his claim about the independent DNA testing in state court,

meaning it can be considered in the cumulative ineffective assistance analysis.

### h. Claim B(8)(d): Failure to object to the admission of the recording on the victim's answering machine

Hammonds, in Claim B(8)(d), argues that trial counsel's failure to object to the

State's introduction of a recording left by the victim's mother on the victim's answering

machine on the date of her death amounted to ineffective assistance. More specifically he

claims that counsel should have objected to the recording as more prejudicial than

20

probative and that this failure violated his Sixth Amendment right to effective assistance of counsel. The State conversely argues that this claim is procedurally defaulted because Hammonds never raised it in his Rule 32 petition. (Doc. # 68 at 9.)

Hammonds argued in his Rule 32 petition that trial counsel failed to assist him effectively by not objecting to several pieces of prejudicial evidence. Yet he did not list the answering machine recording as one such example. (Vol. 40, R. 62, at 39, 46.) And although Hammonds mentioned the answering machine recording in his Rule 32 petition, he did so only in the context of his prosecutorial misconduct claim. Hence he did not clearly present the factual allegations, coupled with the appropriate federal standard, to the state courts. This deprived the state courts of an adequate opportunity to rule on the merits of his claim related to counsel's failure to object to the admission of the recording. Because the state courts never had this opportunity, the claim is procedurally defaulted. Accordingly, the Court will not consider it when addressing his cumulative ineffectiveness claim.

### i. Claim B(12)(a): Failure to move to have additional counsel appointed

Hammonds' next ineffectiveness argument centers on trial counsel's decision to not move to have additional counsel appointed. (Doc. # 6 at ¶ 82.) The State responds by asserting that Hammonds' Rule 32 motion did not raise this ground for an ineffectiveness claim. (Doc. # 68 at 9–10.) The State is incorrect. Hammonds' amended Rule 32 motion states, "Among the motions trial counsel failed to pursue were their motion for appointment [of] additional counsel . . . ." (Vol. 42, R. 66, at 472.) Because Hammonds clearly presented this claim to the state courts, the Court will consider it when

adjudicating his cumulative ineffectiveness claim.

### j. Claim B(12)(b): Failure to move for extraordinary expenses for the assistance of a psychiatric expert

Hammonds contends that his trial counsel were ineffective for failing to pursue a motion for extraordinary expenses for psychiatric assistance. (Doc. # 6 at ¶ 82.) Trial counsel made the motion for extraordinary expenses, but then failed to pursue the motion after the trial court deferred ruling. (Vol. 42, R. 66, at 473.) The State argues that Hammonds' Rule 32 motion did not raise this claim of ineffectiveness. (Doc. # 68 at 10-11.) Hammonds' amended Rule 32 motion, however, states, "Among the motions trial counsel failed to pursue were . . . their motion for extraordinary expenses for expert psychiatric assistance . . . ." (Vol. 42, R. 66, at 472.) This claim was properly raised below and this claim and must be analyzed on the merits and considered during the cumulative analysis of trial counsel's alleged ineffectiveness.

### k. Claim B(12)(d): Failure to move for an order prohibiting the prosecutor from referring to Hammonds by anything other than his given name

Hammonds also argues for trial counsel's ineffectiveness by noting how his lawyers failed to request an order barring the prosecution from referring to Hammonds by anything other than his given name. Like with Claim B(12)(b), trial counsel moved for the order initially but failed to follow up on it after the trial court deferred ruling. (Vol. 42, R. 66 at 473.) And also like Claim B(12)(b), the State incorrectly contends that Hammonds' Rule 32 motion did not raise this issue. Hammonds' amended Rule 32 motion states, "Among the motions trial counsel failed to pursue were . . . on their motion to prevent Mr. Valeska from referring to Mr. Hammonds at trial by anything other than

his given or Christian name. . . ." (Vol. 42, R. 66, at 473.) This suffices under *Kelley* to exhaust the claim, so it is not procedurally defaulted. The Court will therefore consider it.

### l. Claim B(12)(e): Failure to move for an evaluation to determine Hammonds' competency to stand trial

Hammonds contends that his trial attorneys did not assist him effectively when they failed to move for a psychiatric evaluation despite knowing that Hammonds previously suffered from visual and auditory hallucinations and had a family history of mental illness. (Doc. # 6 at ¶ 83.) Despite the State's argument that this claim is procedurally defaulted, it too is clearly included in Hammonds' Rule 32 petition. (*See* Vol. 42, R. 66, at 472 ("Their failure to move for a professional evaluation of Mr. Hammonds's competency constituted ineffective assistance and deprived Mr. Hammonds of his right to counsel.").) The state courts denied Hammonds' claim on the merits. (Vol. 51, R. 83, at 26.) Accordingly, Hammonds properly raised this claim on the merits, so the Court will consider it when ruling on the merits of his overarching ineffectiveness claim.

### m. Claim B(13)(a): Failure to present mitigating evidence and failure to prepare witnesses adequately

In his petition to this Court, Hammonds argues that his right to assistance of counsel was violated when his trial attorneys failed to present all available mitigating evidence and failed to prepare properly the mitigation witnesses that were presented. (Doc. # 6 at ¶ 85.) Specifically, Hammonds contends that trial counsel's failure to prepare his mother, Annie Hammonds, and aunt, Lois George, before the penalty phase of trial resulted in both women being defensive and obstinate during cross-examination.

Hammonds raised both of these arguments in his second amended Rule 32 petition.[5] (Vol. 43, R. 68, at 717–19.)

The State asserts that this claim is defaulted, arguing that Hammonds did not raise these grounds for relief in his Rule 32 petition. (Doc. # 68 at 13–14.) However, Hammonds sufficiently disclosed to the state courts his claim that his attorneys failed to present enough mitigation evidence and failed to prepare those witnesses that were presented. Therefore, this claim was properly raised below and the Court will analyze it on the merits during the cumulative analysis of trial counsel's alleged ineffectiveness.

### n. Claim B(13)(b): Failure to interview Hammonds' family and friends about mitigating evidence

Hammonds claims that his trial counsel's failure to interview witnesses willing to testify on his behalf during the penalty phase of trial amounted to ineffective assistance of counsel. (Doc. # 6 at ¶ 86.) The State again argues that the claim is defaulted because Hammonds' Rule 32 motion does not mention it. And again the State is incorrect. Hammonds' second amended Rule 32 motion says, "Had counsel contacted Mr. Hammonds's family, friends, and other people who had interacted with Mr. Hammonds when he was growing up, and adequately investigated the lives of those they did contact, they could have presented an accurate portrait of Mr. Hammonds." (Vol. 43, R. 68, at

---

[5] *See* Vol. 43, R. 68, at 717–19 ("[T]rial counsel failed to prepare Annie Doris Hammonds, Mr. Hammonds's mother, prior to her appearance on the stand. . . Counsel compounded this deficient performance by doing nothing to prepare Ms. Hammonds for cross examination."; "[T]rial counsel placed Ms. George on the stand without adequate preparation."; "Mr. Hammonds was entitled to have all aspects of his background, family life, medical history, school records, and any other life experience that might be considered mitigating evidence evaluated and, if helpful, presented to the judge and jury at the penalty phase of his capital trial. Mr. Hammonds [sic] trial counsel failed to meet this constitutional obligation, thereby depriving him of his right to counsel.").

731–32.) Hammonds, moreover, lists nine potential mitigation witnesses that counsel

failed to interview. This included Cherita Hayes, the mother of one of his children. (*Id.* at

731.) The Court thus finds that Hammonds fairly presented this claim to the state courts

in his Rule 32 petition, thereby precluding a finding of procedural default.

### o. Claim B(13)(c): Failure to introduce mitigating evidence about Hammonds' relationship with his children

To further support his claim that trial counsel were ineffective during the penalty

phase, Hammonds points out that they failed to introduce mitigating evidence

demonstrating that Hammonds had a loving relationship with his children, Artecia and

Cordney. (Doc. # 6 at ¶ 87.) The State asserts that Hammonds failed to raise this claim in

his Rule 32 motion and therefore defaulted on it. (Doc. # 68 at 14–15.) This time the

State is correct. Although Hammonds pointed out a number of claimed deficiencies in

counsel's performance during the penalty face, his Rule 32 petition omits any mention of

his relationship with his children.

Indeed, the section in Hammonds' second amended Rule 32 petition devoted to

trial counsel's deficient presentation of mitigation evidence focuses on Hammonds' past

and his mental health history to explain his actions and "lessen[] Mr. Hammonds's

culpability for the crime." (Vol. 43, R. 68, at 732–33.) The federal habeas petition

presents a different argument, however, stating that presenting evidence about his

relationship with his children would paint a more positive picture of Hammonds and

"convey the immeasurable value of Mr. Hammonds's life." (Doc. # 6 at ¶ 86.) *Kelley*

instructs a district court to ignore on the merits any "particular factual instances of

ineffective assistance of counsel . . . that were not first presented to the state courts." 377 F.3d at 1344. Because Hammonds never presented to the state courts his argument that counsel provided deficient assistance by failing to put on evidence about his role as a loving father, this Court cannot now consider the claim.

### p. Claim B(14)(a): Failure to investigate circumstances related to Hammonds' alcoholic father

The next claimed instance of ineffective assistance involves trial counsel's failure to investigate Hammonds' traumatic upbringing and alcoholic father, and failing to present evidence about his upbringing to the penalty phase jury. (Doc. # 6 at ¶¶ 88–89.) Once again the State says Hammonds procedurally defaulted on the claim by not presenting it in his Rule 32 petition. (Doc. # 68 at 15–16.) The Court finds the State's argument without merit. Eight paragraphs spanning five pages of Hammonds' Rule 32 petition are dedicated to this claim. The petition presented to the state courts explains how Hammonds' father assaulted his mother, Hammonds, and his siblings until the day his father committed suicide. (Vol. 43, R. 68, at 722–26.) This suffices to meet the admittedly strict *Kelley* standard and, accordingly, the Court will consider the claim's merits.

### q. Claim B(14)(b): Failure to investigate how Hammonds overcame a traumatic childhood to become a loving father

Hammonds similarly argues that his trial counsel were ineffective for failing to present to the penalty phase jury evidence regarding "Mr. Hammonds's ability to conquer his childhood demons as an adult so that he could be a committed—even though physically absent—father to his own children." (Doc. # 6 at ¶ 89.) And the State once

again argues this claim is procedurally defaulted because Hammonds never presented it to the state courts hearing his Rule 32 petition. (Doc. # 68 at 16–17.) This time the State is correct: Hammonds' second amended Rule 32 petition makes no mention of his overcoming his childhood hardships to become a committed father. Nor does his petition assert that trial counsel provided ineffective assistance at the penalty stage for failing to investigate these facts. (Vol. 43, R. 68, at 721–26.) The Court is thus barred from hearing this claim on the merits.

### r. Claim B(15): Cumulative effect of the above-mentioned failures

Paragraphs 90 through 92 of Hammonds' habeas petition contend the state courts misapplied federal law by analyzing his ineffectiveness arguments claim-by-claim. To this end, Hammonds argues that the state courts should have applied the cumulative approach endorsed by *Terry Williams v. Taylor*, 529 U.S. 362, 398–99 (2000). (Doc. # 6 at ¶ 33–34.) The section of Hammonds' petition merely sets up his claim for relief on the merits; indeed, he cites the standard set forth in § 2254 and argues that he can meet it. Therefore, it is not a distinct claim for relief but rather a substantive argument. And because it is not a district claim, the State's argument regarding procedural default is mooted.

### 2. The failure to provide a complete record for appeal (Claim G)

Moving away from his ineffective assistance claim, Hammonds claims the trial court violated his constitutional rights by failing to provide a complete appeal record. According to Hammonds, the record did not include juror questionnaires, which made reviewing his jury selection claims almost impossible. (Doc. # 6 at ¶¶ 110–15.)

27

Hammonds made this argument to the Circuit Court of Houston County in his Rule 32 petition. But the circuit court found the claim procedurally barred under Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure because Hammonds could have but did not raise the issue at trial or on direct appeal. (Vol. 40, R. 62, at 181.) The Alabama Court of Appeals agreed, finding that the circuit court properly dismissed the claim. (Vol. 51, R. 83, at 9.)

Hammonds correctly admits this claim is procedurally defaulted. (Doc. # 47 at 82.) So he instead argues that the cause for the default is ineffective assistance of appellate counsel. (Doc. # 47 at 82.) More specifically, Hammonds claims that but for appellate counsel's ineffective assistance, he would have argued on appeal that the incomplete record violated his constitutional rights.

Counsel's failure "to recognize the factual or legal basis for a claim" or his failure to "raise the claim despite recognizing it" does not give rise to cause for a procedural default. *See Murray v. Carrier*, 477 U.S. 478, 486 (1986). Rather, an attorney's failure to raise a claim at trial or on direct appeal amounts to cause to excuse a procedural default "only if the error rises to the level of constitutionally deficient assistance of counsel under the Sixth Amendment." *Eagle v. Linahan*, 279 F.3d 926, 937 (11th Cir. 2001). So to overcome the procedural default by cause and prejudice, Hammonds must show that his appellate counsel rendered constitutionally deficient assistance by failing to argue that the incomplete appellate record violated his constitutional rights, and that he suffered prejudice as a result.

The record reveals that Hammonds argued, on direct appeal, that the trial court

erred in eight ways—each of which were claims for relief. But none of those grounds related to jury selection in any way.[6] Because the jury questionnaires had no relevance to the grounds of relief raised on appeal, Hammonds did not suffer prejudice on direct appeal by way of his attorney's error. Nor can Hammonds show cause: counsel's failure to ensure that the appellate record contained the jury questionnaires does not fall below the objective reasonableness standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Thus Hammonds cannot use his appellate counsel's performance to overcome his procedural default.[7]

### 3. Hammonds' claim about the State's violation of discovery orders (Claim H)

Hammonds' next claim for relief centers on the trial court's decision not to sanction the District Attorney for violating the court's discovery orders. He claims this failure caused a violation of his rights to a fair trial, due process, and equal protection of law. Hammonds raised this claim in his Rule 32 motion in the context of judicial bias against him. (Vol. 42, R. 66, at 502–05.) The Alabama Court of Criminal Appeals found these claims procedurally barred by Rule 32.2(a)(5) of the Alabama Rules of Criminal

---

[6] Hammonds argued on direct appeal that the trial court erred in the following ways: (1) by not suppressing the DNA evidence obtained from the blood sample retrieved from him in 1996; (2) by admitting into evidence the results of DNA testing; (3) by denying a mistrial after the prosecutor commented on Hammonds' right to remain silent; (4) by denying a mistrial after the prosecutor mentioned Hammonds' prior incarceration; (5) by denying Hammonds' motion for a change of venue; (6) by denying a motion for mistrial after the court asked questions to the State's witness; (7) by refusing to give the jury a requested instruction regarding DNA evidence; and (8) by refusing to recuse himself. *Hammonds v. State*, 777 So. 2d 750 (Ala. Crim. App. 1999).

[7] Alternatively, Hammonds cannot overcome the procedural default because he cannot show that he raised the appropriate claim for ineffective assistance below. Under *Murray*, ineffective assistance of counsel can serve as the basis for cause and prejudice only if the petitioner presented a corresponding claim of ineffective assistance to the state court. 477 U.S. at 489. While Hammonds raised a claim for ineffective assistance in his Rule 32 petition, he made no mention of counsel's failure to ensure the completeness of the appellate record.

Procedure. (Vol. 51, R. 83, at 9.)[8] Notably, Rule 32.2(5) bars the state courts from granting relief on any claim that could have been but was not raised on appeal.[9]

Although neither party discusses cause and prejudice in the Joint Report (Doc. # 47 at 83), Hammonds contends in his merits brief that he can overcome any procedural default by showing his appellate counsel assisted him ineffectively. (Doc. # 95 at 152.) More simply, Hammonds claims that, but for his appellate counsel's ineffectiveness, he would have raised this claim on direct appeal. As a general rule, an attorney's failure to raise a claim at trial or on direct appeal amounts to cause to excuse a procedural default "only if the error rises to the level of constitutionally deficient assistance of counsel under the Sixth Amendment." *Eagle*, 279 F.3d at 937. To show appellate counsel performed in a constitutionally deficient way, Hammonds must satisfy both of *Stickland*'s criteria— that is, he must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced him.

Hammonds' brief makes no argument about why a failure to raise a particular claim on appeal satisfies *Strickland*. Indeed, "the mere fact that counsel failed to

---

[8] The Alabama Court of Criminal Appeals found that Rule 32.2(a)(5) barred Hammonds' claim that the trial court exhibited bias against Hammonds' trial counsel in its handling of various matters. Unlike his federal claim, Hammonds' state claim did not relate only to discovery matters. But the state appellate court's opinion refers to Claim XI.B, which corresponds to the claim in Hammonds' Rule 32 petition about the prosecutor disregarding the discovery policy of the trial court. The court of criminal appeals made reference to the original Rule 32 petition, not the amended or second amended petition.

[9] The State says in the Joint Report that both Rule 32.2(a)(2) and (a)(5) bar this claim. (*See* Doc. # 47 at 83.) The Alabama Court of Criminal Appeals did not, however, rely on Rule 32.2(a)(2) to find this claim procedurally barred. So this Court will not consider it as a ground for procedural default. Hammonds, on the other hands, argues in the Joint Report that the claim is not procedurally barred because he raised it at trial. (*See id.*) But this does not suffice to overcome the procedural default doctrine; he had to raise it on direct appeal, too.

recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray*, 477 U.S. at 486. Hence the Court cannot find that Hammonds established cause and prejudice sufficient to excuse his procedural default, which bars consideration of this claim on the merits.[10]

### 4. Hammonds' claim that the trial court failed to provide him with adequate funds to retain experts (Claim I)

Hammonds next argues that the trial court violated his rights by not providing adequate funds to hire DNA experts, a jury expert, or a mitigation expert. (Doc. # 6 at ¶¶ 120–24.) According to Hammonds, denying him these funds violated his rights to due process, equal protection, a fair trial, and a reliable sentencing. (*Id.* at ¶ 124.) The State, on the other hand, contends that Hammonds never exhausted this claim because he never raised it at trial or on direct appeal or in the Rule 32 proceedings. (Doc. # 47 at 85–87.) Hammonds responds to the State by noting that he raised the claim during the evidentiary hearing on his Rule 32 petition.

Only two passages of the relevant portions of the record deal with the alleged lack of funds to retain experts. The first is an exchange between Ms. McClary, Hammonds' attorney for the Rule 32 proceedings, and Mr. Decker, Hammonds' trial and appellate counsel. The transcript reveals the following:

---

[10] Alternatively, Hammonds cannot overcome the procedural default because he cannot demonstrate that he raised the appropriate claim for ineffective assistance below. *Murray* states that ineffective assistance of counsel may only serve as the basis for cause and prejudice if a corresponding claim of ineffectiveness was presented to the state court. 477 U.S. at 489. While Hammonds did raise a claim for ineffective assistance of appellate counsel in his Rule 32 petition, no mention is made of counsel's failure to appeal based on the trial court's bias.

| McClary: | . . . why did you not employ a jury expert to help you and Ms. Nemish pick members of the jury from the venire? |
| --- | --- |
| Decker: | We had no funds to do that. |
| McClary: | Did you request funds to do that? |
| Decker: | I don't know if we specifically requested that. We requested the funds; I know the judge approved funds for Dr. Natalie Davis who helped us with the change of venue motion. And, we used the data that she had obtained through her survey that she conducted to help us develop a profile that we used to help strike the jury. |
| McClary: | So, you are testifying Mrs. Davis helped you develop a profile or Mrs. Davis helped you figure out the likelihood of some of the jurors would be that you would be selecting from? |
| Decker: | Some of both. Her information, report provided us with information that would help us find people that would be favorable to Mr. Hammonds. But, to answer the original question, did we hire a jury expert? No. |

(Vol. 45, R. 70, at 128.)

Hammonds also points to the following exchange between Ms. Speagle, one of the

State's attorneys, and Ms. Nemish, one of Hammonds' trial attorneys:

| Speagle: | Okay. Did you seek a psychiatric evaluation as well as psychological? |
| --- | --- |
| Nemish: | No, we did not. |
| Speagle: | Why not? |
| Nemish: | Well, didn't have any grounds to do that, so I didn't. |
| Speagle: | Was that based on what the psychologist had |

32

|              | already told you?                                                                                                                                                                                                                                                                                                                                                                                              |
| ------------ | ---- |
| Nemish:      | Correct.                                                                                                                                                                                                                                                                                                                                                                                                        |
| The Court:   | Wait a minute. I am confused. I thought you didn't seek a psychological evaluation as we commonly do in some cases because you had your own psychologist and he said it might be worse if you made such a request. Did I misunderstand? Am I misunderstanding? |
| Nesmish:     | If I may—                                                                                                                                                                                                                                                                                                                                                                                                       |
| The Court:   | Yes.                                                                                                                                                                                                                                                                                                                                                                                                            |
| Nemish:      | We made application for funds for a psychologist and psychiatrist. You granted us funds for a psychologist at the time and held on the psychiatrist, pending grounds. When we got the psychologist, which is the one I am speaking about, we secured him to do this evaluation first to determine if we needed to do more. That is where we got his assessment and that also, I think, answers you question why we didn't go to the psychiatrist, we had no grounds. |

(R. 70 at 180–81.)

These stray references to a lack of funds do not fairly present the federal constitutional claim to the state courts. The transcript reveals that no one brought up how the lack of funds may have prejudiced Hammonds' defense or violated his constitutional rights. What is more, neither the state trial court nor the court of criminal appeals addressed the lack of expert funds in their respective Rule 32 orders. This strongly suggests that the state courts never had an opportunity to confront this question because Hammonds never presented it to them. Accordingly, the procedural default bars the Court from granting relief to Hammonds to the extent that he claims the lack of financing denied him the right to a fair trial.

### 5. Hammonds' claim that the trial court improperly admitted prejudicial, nonprobative evidence (Claim L)

Hammonds' habeas petition next claims that the State improperly introduced, and the trial court improperly admitted, highly prejudicial and nonprobative evidence used to inflame the jurors' passions. (Doc. # 6 at ¶ 127.) Hammonds' petition references his earlier claim about trial counsel's ineffectiveness for failing to object to the admission of six pieces of evidence: (1) autopsy photographs of Marilyn Mitchell's body; (2) evidence of Mitchell's good character; (3) evidence that someone had stolen property from Mitchell's condo; (4) an answering machine recording left by Mitchell's mother; (5) evidence that Hammonds had seen a movie with a woman other than his wife; and (6) evidence that Hammonds liked to have sex with white women. (Doc. # 6 at ¶ 71.)

Hammonds raised this issue in his initial Rule 32 motion. (Vol. 40, R. 62, at 70.) The Houston County Circuit Court found that claim barred by Rule 32.2(a)(2) and (3) of the Alabama Rules of Criminal Procedure. (Vol. 40, R. 62, at 181.) The Alabama Court of Criminal Appeals affirmed this finding, holding that Hammonds defaulted on the claim because he did not raise it on appeal. (Vol. 51, R. 83, at 9.) The State agrees with the court of appeals, arguing that the procedural default bars this Court from granting relief.

Hammonds concedes that the claim is defaulted. But he argues that he can show cause and prejudice, and he relies once again on claiming that trial counsel provided ineffective assistance by failing to object to the evidence. Because ineffective assistance of counsel can provide cause for a default, *see Murray v. Carrier*, 477 U.S. 478, 488–89

34

(1986), the Court will undertake the procedural default analysis for Claim L *after*

analyzing Hammonds' various ineffective assistance of counsel arguments on the merits.

### 6. Hammonds' claim that the State improperly withheld exculpatory evidence (Claim M)

Hammonds' next claim alleges that the State failed to turn over two important

documents. The first is an agreement the State made with Gregory Gordon, one of its key

witnesses. The second is a VICAP report used by the FBI to create a suspect profile.

According to Hammonds, the State's failure to disclose these documents violated *Brady v.*

*Maryland*, 373 U.S. 83 (1963) (holding prosecution must turn over exculpatory evidence),

thus depriving him of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. #

6 at ¶¶ 128–31.)

The Houston County Circuit Court found this claim procedurally barred by Rule

32.2(a)(5) of the Alabama Rules of Criminal Procedure since Hammonds could have

raised the issue on direct appeal. (Vol. 43, R. 68, at 748.) The Alabama Court of Criminal

Appeals concurred. (Vol. 51, R. 83, at 11.) The State urges this Court to adopt the state

appellate court's holding and find the claim procedurally defaulted and thus barred from

consideration.

Hammonds does not dispute that this claim is procedurally defaulted. (*See* Doc. #

6 at ¶¶ 128–31.) Rather, Hammonds argues that he can show the necessary cause and

prejudice to excuse the procedural default. (Doc. # 47 at 91–92.) To this end he claims

that the State's suppression of the evidence prevented him from presenting the argument

on direct appeal. (*Id.*) And for support he cites to *Banks v. Dretke*, 540 U.S. 668 (2004), a

case holding that the suppression of evidence can sometimes serve as cause to excuse a procedural default.

In *Banks*, the Supreme Court focused on fairness to the defendant. By enforcing procedural default rules where the state has suppressed evidence, courts would force defendants to raise *Brady* claims about evidence that they likely would not know exists. This would unfairly place the burden of discovering exculpatory evidence in the state's possession on the shoulders of criminal defendants. Thus *Banks* says that "defendants [need not] scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." 540 U.S. at 695.

But the logic of *Banks* does not apply here. As the Alabama Court of Criminal Appeals noted, Hammonds could have, but did not, raise his *Brady* claim on appeal. If Hammonds had yet to discover the existence of suppressed exculpatory evidence at the time of his appeal, then *Banks* would apply and allow him to claim that the State's suppression caused the procedural default. Hammonds, however, pointed out in his Rule 32 petition that he knew about both the Greg Gordon deal and the VICAP report before filing his appeal. (Vol. 42, R. 66, at 509–10.) In fact, trial counsel filed a formal request for the VICAP report on April 15, 1997—well after the state should have disclosed it, but still before Hammonds' trial began. (*Id.* at 509.) By the same token, the State dropped Gordon's cocaine possession charges eleven days before Hammonds received his sentence, so Hammonds knew about the possibility that Gordon had received a deal from the State well before he filed his appeal.

*Banks*, moreover, deals with situations where the State's suppression of evidence

prevents a defendant from raising the claim at the first appropriate state proceeding. When the defendant does raise such a claim, the suppression can serve as cause for excusing the procedural bar. Here, the State's alleged suppression did not prevent Hammonds from raising his claim on appeal. Consequently, *Banks* does not support his cause and prejudice argument. His *Brady* claim is therefore procedurally defaulted.

### 7. Hammonds' claim that the trial court erred by failing to instruct the jury that his age at the time of the offense was a mitigating factor (Claim N)

In his petition, Hammonds claims the trial court erred by not instructing the jury that it had to consider his age at the time of the crime as a mitigating factor when determining his sentence. (Doc. # 6 at ¶¶ 132–34.) The State again argues for procedural default, noting how Hammonds never raised this claim at any state proceeding, whether directly or during collateral appeal. (Doc. # 47 at 93.) Hammonds does not disagree; instead, he argues that counsel's ineffectiveness prevented him from raising this claim at trial or on appeal.

Even if the Court agreed with Hammonds about the ineffectiveness of trial and appellate counsel, he still failed to raise the claim during his Rule 32 proceedings. Because a criminal defendant generally has no right to an attorney after direct appeal proceedings, any attorney error during state habeas proceedings that leads to default in state court "cannot constitute cause to excuse the default in federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 757 (1991); *see also Mize v. Hall*, 532 F.3d 1184, 1191 (11th Cir. 2008) ("Because a petitioner has no right to counsel during state collateral review, even grossly ineffective assistance at the collateral review stage, or no assistance at all,

37

does not constitute cause to excuse a procedural default."). Hammonds raises no other grounds for his procedural default. Therefore, the Court finds that Hammonds has failed to show cause and prejudice on his claim that the trial court erred by failing to instruct the jury about the mitigating potential of his age. With the claim in procedural default, the Court cannot use it as the basis for granting Hammonds relief.

### 8. Hammonds' claim that the jury considered extraneous evidence when rendering a verdict (Claim P)

Hammonds claims in his petition that the jurors considered outside evidence and ignored the judge's instructions not to discuss the case with others or amongst themselves before deliberations began. (Doc. # 6 at 49–50.) Specifically, Hammonds claims that juror Andrea Chavez, while sequestered, used her cell phone to call her husband, and that the jurors discussed the case during breaks in the trial despite the trial judge's instructions to the contrary. As to Chavez, the trial judge confronted her about the phone calls, but he never asked if the other jurors received improper information as a result of those calls.

The record reveals that Hammonds raised these arguments in some fashion in his Rule 32 petition. There he claimed that juror misconduct violated his right to a fair trial by an impartial jury. The Circuit Court of Houston County found that Hammonds had not demonstrated how the juror's cell phone usage prejudiced him and noted how he could have raised the claim on direct appeal but did not do so. (Vol. 51, R. 82, at 748.) The Court of Criminal Appeals addressed the merits of this claim, too, but found that Hammonds had failed to put forth sufficient evidence to warrant relief. (Vol. 51, R. 83, at 11–12.) Because the last court to review Hammonds' claim made a decision on the merits,

this Court can do the same. Hammonds' claim on this point is addressed below.

### 9. Hammonds' claim that jurors' failure to truthfully answer voir dire questions deprived him of his right to an impartial jury (Claim Q)

Hammonds claims that a number of jurors failed to answer voir dire questions honestly, thereby depriving him of his right to a fair trial with an impartial jury. (*See* Doc. # 6 at ¶¶ 145–49.) According to Hammonds, Juror Don Jones never disclosed that he knew several witnesses who were expected to testify. Similarly, jurors Jimmie Bryant and Vera Hayles allegedly concealed their knowledge about Hammonds' incarceration for another, unrelated crime. And Bryant, along with Andrea Chavez, ostensibly failed to disclose that they knew or had a familial connection to members of the Dothan Police Department. The State concedes that Hammonds raised this claim in his Rule 32 motion and admits that the Alabama Court of Criminal Appeals addressed the claim on the merits. (Doc. # 47 at 98–104.) Still, the State contends that Hammonds did not properly raise the claim either during trial or on direct appeal, meaning the claim is procedurally barred.

The cases the State cites hold that, if a state court refuses to adjudicate a claim on the merits because of a procedural default, then a federal court must respect that adequate and independent state ground for denying relief. Here, however, the state courts did not apply a procedural default rule. *Cf. Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991) (en banc) ("Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar . . . and that bar provides an adequate and independent state ground for denying relief."). To the contrary, the Alabama Court of

Criminal Appeals disposed of the claim on the merits, finding that Hammonds failed to present sufficient evidence to warrant relief. Accordingly, this Court can address the merits, too.

### 10. Hammonds' claim that the trial judge erred by refusing to strike prospective juror James Adkinson for cause (Claim R)

During voir dire, prospective juror James Adkinson revealed that he had a close professional relationship with the victim's father. Hammonds moved the trial court to strike Adkinson for cause, arguing that his relationship with the victim's father amounted to a bias in favor of the State. The trial judge refused this request. Now, in his habeas petition, Hammonds claims that the trial court's refusal violated his rights to due process, a fair trial, and a reliable sentencing. (Doc. # 6 at ¶¶ 150–51.) Hammonds raised this issue in his Rule 32 motion. (Vol. 40, R. 62, at 98, 105.) The Houston County Circuit Court found that this claim was procedurally barred, and the Alabama Court of Criminal Appeals upheld that determination. (Vol. 51, R. 83, at 11 (finding claim barred by Rule 32.2(a)(5)).) Hammonds does not dispute this. (Doc. # 47 at 105). Rather, he argues that the incompetence of both trial counsel and appellate counsel caused the procedural default. (Doc. #47 at 105).

As discussed above, to demonstrate that counsel's ineffective assistance caused a procedural default, a petitioner must demonstrate that counsel's performance fell below an objective standard of reasonableness. *Eagle*, 279 F.3d at 937. Yet Hammonds' brief makes no argument as to why a failure to raise a particular claim on appeal satisfies the constitutional standard for ineffectiveness of counsel. As the Supreme Court has stated,

"the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray*, 477 U.S. at 486. Accordingly, this Court cannot find that Hammonds established cause and prejudice sufficient to excuse his procedural default and, thus, this claim will not be considered on the merits.[11]

### 11. Hammonds's claim that the trial court erred by not conducting individual voir dire (Claim S)

Hammonds' petition claims that the trial court erred by not conducting individual voir dire regarding automatic imposition of the death penalty. (Doc. # 6 at ¶¶ 152–55.) He does not dispute that this claim is defaulted. (Doc. # 47 at 105.) Instead, he asserts that ineffective assistance of counsel led to the default because none of his lawyers raised this claim at trial or on appeal. (Doc. # 47 at 105.) But again Hammonds' argument regarding cause and prejudice is deficient. His merit brief does not set out why counsel's failure to raise the trial court's error about individual voir dire falls below the objective standard of reasonable performance. As noted in discussing the above claim, counsel's mere failure to raise an issue does not, without more, suffice to establish cause to overcome a procedural default. *Murray*, 477 U.S. at 486. Therefore, the Court finds that Hammonds failed to establish cause and prejudice sufficient to excuse his procedural default.

---

[11] Alternatively, Hammonds cannot overcome the procedural default because he cannot show that he raised the appropriate claim for ineffective assistance below. *Murray* states that ineffective assistance of counsel may only serve as the basis for cause and prejudice if the defendant presented a corresponding claim of ineffectiveness to the state court. 477 U.S. at 489. While Hammonds did raise a claim for ineffective assistance of appellate counsel in his Rule 32 petition, he made no mention of counsel's failure to challenge the trial court's alleged error regarding juror James Adkinson.

**12. Hammonds' claim that the trial court exhibited bias during trial (Claim T)**

Hammonds also asserts that the trial court favored the prosecution throughout his trial. More specifically, Hammonds claims the trial court refused to declare a mistrial or impose sanctions, even in the face of rampant prosecutorial misconduct; made disparaging remarks about trial counsel; assumed a prosecutorial role during trial; refused to strike a nonresponsive brief filed by the State; and refused to remove jurors who engaged in misconduct. (Doc. # 6 at ¶¶ 156–64.) Once again the State argues that Hammonds procedurally defaulted (Doc. # 47 at 106–111), and Hammonds does not dispute the State's contention.

Hammonds argues that he can show cause for his procedural default, however, by pointing to trial counsel's supposed ineffectiveness. But once again Hammonds merely asserts that his lawyers provided deficient assistance by failing to raise these claims; he does not say *why* failing to raise these arguments amounted to a violation of his constitutional rights. And without showing why counsel's failure to raise the argument meets the test set out in *Strickland*, Hammonds cannot overcome the procedural default. So once again the Court must find his claim procedurally defaulted and conclude that it cannot examine the claim on the merits.

**13. Hammonds' claim that the methods of execution Alabama uses constitute cruel and unusual punishment (Claim U)**

Finally, Hammonds argues that Alabama's method of executing prisoners using either electrocution or lethal injection amounts to cruel and unusual punishment. (Doc. # 6 at ¶¶ 57–59.) When the trial court sentenced Hammonds, Alabama executed inmates by

electrocution. Since then the State has adopted lethal injection as its new method of execution, and it gave inmates already on death row 30 days in which to opt out of the new execution protocol. *See McNair v. Allen*, 515 F.3d 1168, 1171 (11th Cir. 2008).

Hammonds, in his Rule 32 petition, argued that Alabama's electrocution protocol violated the Constitution's Cruel and Unusual Punishment Clause. The Alabama Court of Criminal Appeals found the claim in procedural defaulted under Rule 32.2(a)(5), noting that Hammonds could have but did not raise it on direct appeal. (Vol. 51, R. 83, at 11.) On this part of Claim U, Hammonds admits that a procedural default occurred, but he argues that counsel's ineffectiveness caused it. Like with a number of the claims discussed above, Hammonds fails to set out the grounds for his cause and prejudice argument. And also like the above arguments, the Court must note that counsel's failure to raise a claim will not alone suffice to establish cause. *Murray*, 477 U.S. at 486. Because Hammonds failed to support his claim that counsel's ineffectiveness should excuse his procedural default, the Court cannot consider it now.

The State also contends that Hammonds' claim about the constitutionality of its lethal injection protocol is procedurally defaulted, for he failed to raise it on direct appeal. (Doc. # 47 at 112.) Furthermore, the State asserts that the Rule 32 court and the Court of Criminal Appeals found the claim procedurally defaulted for the same reason. The Court disagrees, however, because the state courts only found Hammonds' electrocution-related claims in procedural default.

Alabama changed its preferred method of execution from electrocution to lethal injection on July 1, 2002. So the change occurred *after* Hammonds filed his original Rule

43

32 petition (February of 2002), but *before* the evidentiary hearing on his petition (held on August 2, 2002). Moreover, the arguments Hammonds made as they relate to why electrocution amounts to cruel and unusual punishment were particular to that method— for example, the slow nature of death caused by electrocution and the potential for burning and excruciating pain—and do not apply to lethal injection. Therefore, the Court finds that Hammonds' electrocution claims do not encompass his lethal injection claim. Along these same lines, the Court finds that because Hammonds did not raise his lethal injection claim at the state level it is not properly exhausted.[12]

Typically, if a claim remains unexhausted at the state level, the federal habeas court may remand it back to the state courts for proper exhaustion. But here such an endeavor would be futile. Under Alabama law, the state's courts will not entertain a successive habeas petition unless the petitioner can show why the new grounds "could not have been ascertained through reasonable diligence when the first petition was heard." Ala. R. Crim. P. 32.3(b). Hammonds cannot meet this standard as to his lethal injection claim: the evidentiary hearing on his Rule 32 petition, because it was held after the change in execution protocol, thus giving Hammonds ample opportunity to discover the basis for raising the issue through reasonable diligence. Because remanding the claim would amount to nothing more than an exercise in futility, the Court finds Hammonds' lethal injection claim procedurally defaulted and thus barred from review.

---

[12] Hammonds claims that he was unable to raise such an argument at the Rule 32 stage because the change in the law occurred a mere month before his evidentiary hearing. While the short time span may have affected the depth and quality of any argument regarding lethal injection, Hammonds was not wholly prevented from bringing the claim.

### 14. Overcoming procedural default through the "miscarriage of justice" exception

"Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Staying true to this principle, the Supreme Court has held that a claim of actual innocence "is not itself a constitutional claim" for relief. *Schlup v. Delo*, 513 U.S. 298, 315 (1995); *Herrera v. Collins*, 506 U.S. 390 (1993) ("actual innocence is not itself a constitutional claim") (internal quotations omitted). But this is not to say that actual innocence has no role to play in habeas review. Quite to the contrary, a habeas petitioner's actual innocence serves a vehicle for vindicating his constitutional claims after a procedural default. This allows a petitioner "otherwise subject" to procedural defenses to get a hearing in federal court so as to avoid a fundamental miscarriage of justice. *Herrera*, 506 U.S. at 404; *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986) (holding fundamental miscarriage of justice exception available "only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence").

Avoiding a procedural bar to a federal court hearing a petitioner's claim on the merits requires the petitioner to show that a "constitutional violation probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence" tending to prove his innocence. *Id.* Hammonds has failed to come forward with any new evidence tending to show his innocence. His amended habeas petition merely recites that he maintains his factual

innocence (Doc. # 6 at ¶ 104), as does his merits brief (Doc. # 95 at 218–19). Without new evidence tending to prove his actual innocence, Hammonds cannot dock his procedurally defaulted claims in the safe harbor of the miscarriage of justice exception. As a result, the Court will not address the procedurally defaulted claims.

### B. Dismissal for failure to state a claim for relief

The State has moved to dismiss a number of the allegations contained in Hammonds' claim for ineffective assistance of counsel. According to the State, a number of these claims are conclusory and fail to state a basis for relief. (Doc. # 68 at 50–55.)[13] The Court disagrees. In fact, the State's briefing on this point merely lists the claim's label, a summary of the claim, and the paragraph of Hammonds' petition in which the offending claim can be found. The State's arguments do not explain what factual allegations Hammonds could have included, nor do they note whether the State had trouble coming up with responses to Hammonds' allegations.

### C. Abandonment of claims

The State, in a footnote in its merits brief, argues that Hammonds abandoned a number of claims by failing to address them in his own merits brief. (Doc. # 105 at 20 n.14.)[14] But the State fails to cite any authority holding that a petitioner can default on a claim in this manner. In addition, the State relies largely on the assumption that Hammonds abandoned various pieces of his ineffective assistance claim by not

---

[13] Specifically, the State challenges sub-claims B(5)(c)–(e), B(6)(b)–(d), B(8)(a)–(c), B(8)(e)–(f), B(10)(a)–(e), B(12)(c), B(12)(f), and B(13)(b)–(c).

[14] The State contends that Hammonds abandoned claims B(1)(a), B(1)(c), B(2)(a), B(3)(a)–(c), B(3)(f), B(3)(h), B(4)(a), B(4)(b), B(5)(a), B(5)(c)–(e), B(6)(b)–(d), B(7), B(8)(a)–(c), B(8)(e), B(8)(f), B(9), B(10)(a)–(d), B(12)(c), B(12)(f), and C(1) and C(2).

addressing each and every one in detail. Hammonds disagrees with this of course, seeing how he views his ineffectiveness claim as a cohesive whole supported by individual instances of ineffectiveness. In fact, Hammonds discusses his overarching ineffectiveness claim throughout his brief, which suggests he had no intention of abandoning any of his subclaims. Because the State has not provided authority for dismissing the claims as abandoned, the Court will analyze each claim that survived the procedural default analysis.

### D. Hammonds' evidentiary hearing request

In the Joint Report, Hammonds requests an evidentiary hearing on a number of his claims. Specifically, he wants the Court to hear evidence on Claims B (including all subparts), C, D, E, I, L, M, P, Q, R, S, and U. (Doc. # 47.) As expected, the State denies that an evidentiary hearing should be held on any of Hammonds' claims. This Court agrees with the State.

### 1. The legal standard

Under AEDPA, a district court generally cannot hold an evidentiary hearing if the petitioner "has failed to develop the factual basis of [his] claim in State court." 28 U.S.C. § 2254(e)(2). But this general rule has an exception. Indeed, a district court can hold an evidentiary hearing if the petitioner shows:

> (A) the claim relies on—
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due

diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* § 2254(e)(2).

Applying this standard requires a two-step analysis. First, the Court must ask whether the petitioner developed the claim's factual basis in state court. *See, e.g.*, *Michael Williams v. Taylor*, 529 U.S. 420, 431 (2000). If the petitioner did not develop the facts in state court, the Court must then determine whether this happened because of a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432. Diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435.

In addition, it should go without saying that a petitioner will not receive an evidentiary hearing on any claim the Court has found in procedural default and for which the petitioner cannot establish cause and prejudice. *See, e.g.*, *Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996) ("A state habeas petitioner is not entitled to an evidentiary hearing in federal court on the merits of a procedurally defaulted claim unless he can first overcome the procedural bar."). Because Hammonds defaulted on Claims I, M, R, S, and U, *Hill* bars an evidentiary hearing and precludes the Court from even attempting the *Michael Williams* analysis. In the same vein, because the petitioner bears the burden of

establishing his entitlement to an evidentiary hearing, *see, e.g.*, *Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir. 1984) (en banc); *Chavez v. Sec'y Fla. Dep't of Corrections*, 647 F.3d 1057, 1060 (11th Cir. 2011), the Court will not entertain any request Hammonds failed to address in his merits brief. Here, he did not mention Claims C, E, L, and P, let alone argue that he is entitled to an evidentiary hearing on them. Accordingly, the Court finds that Hammonds has not met his burden for establishing entitlement to a hearing on those claims and his request for one is due to be denied.

### 2. Failure to develop the factual record at the Rule 32 proceeding

After applying the procedural default rules and addressing the burden of proof, only two of Hammonds' requests for an evidentiary hearing survive: those of Claims B and Q. Hammonds admits that his counsel failed to develop the factual record underlying these claims at the Rule 32 proceeding. For example, Claim Q alleges that four different jurors answered untruthfully during voir dire. Yet Hammonds never called any of these jurors to testify about how their answers differed from the truth.

Even so, Hammonds asserts that the underdeveloped facts do not stem from a "lack of diligence, or some greater fault, attributable to" him or his lawyers. *Michael Williams*, 529 U.S. at 431. According to Hammonds, the record remained underdeveloped because he and his counsel could not prepare adequately for the Rule 32 hearing. (Doc. # 95 at 86.) To support this argument he points to three facts. First, he notes that he could not meet with his attorney before the proceeding because he could not get transportation to Houston County. (*Id.* at 174.) Second, he states that the Rule 32 court denied his repeated requests for a continuance. (*Id.*) Third, Hammonds says that the

49

state court's decision to deny his funding requests for experts and expanded discovery contributed to his inability to present the facts to the Rule 32 court. (*Id.* at 175.) Furthermore, Hammonds states that, although he eventually hired a second attorney, Tonya McClary, to represent him in his Rule 32 proceeding, the trial court did not grant her pro hac vice admission until just two and a half weeks before the hearing and only granted one continuance to allow her time to obtain admission. (*Id.*)

The Court agrees with Hammonds that he and his lawyers had to prepare for the Rule 32 hearing under less than ideal circumstances. His counsel felt inadequately prepared, the trial judge refused a continuance, and he did not get to have extended face-to-face meetings with his attorneys. But even so, Hammonds' request for an evidentiary hearing is due to be denied for the reasons outlined below.

### a. Ineffective assistance of counsel (Claim B)

Hammonds asserts that, because the record as to Claim B is incomplete, he should get the opportunity to present more evidence. During his Rule 32 proceeding, Hammonds presented testimony from his two trial attorneys and his appellate counsel. He even testified himself about what requests he had made of counsel. After this testimony, the Rule 32 court found that Hammonds failed to meet the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). (Vol. 51, R. 82, at 751.) The state court further indicated that, while Hammonds had requested time to pursue other leads, those leads related to his claim of innocence, not his claim of ineffective assistance. (*Id.*)

In his request for an evidentiary hearing, Hammonds does not proffer what new evidence, if any, he could present. It is the finding of this Court that Hammonds

developed the record adequately as it relates to his ineffective assistance claim. And because the record is complete enough to rule on the merits of Hammonds' claim, the Court need not hold an evidentiary hearing. *See, e.g.*, *Stephens v. Kemp*, 846 F.2d 642, 650–51 (11th Cir. 1988) ("Because we are able to determine the merits of appellant's ineffective assistance claims on the basis of the record already before the court, the district court did not err in denying a hearing for the taking of additional evidence in support of those claims.").

Moreover, the Supreme Court's recent decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), limits the ability of federal habeas courts to hold evidentiary hearings. In that case, the Court held "that evidence introduced in federal court has no bearing on § 2254(d)(1) review." 131 S. Ct. at 1400. Here, Hammonds brings almost all of his claims under § 2254(d)(1), including his ineffective assistance claim.[15] As a result, *Pinholster* prohibits this Court from having an evidentiary hearing on Hammonds' ineffective assistance claim, and the Court "is limited to the record that was before the state court that adjudicated the claim on the merits. *Id.* at 1398.

### b. Juror responses during voir dire (Claim Q)

Hammonds claims that he did not have adequate time to prepare for the Rule 32

---

[15] To the extent that Hammonds brings claims under § 2254(d)(2), *Pinholster* would likewise bar his request for an evidentiary hearing. Section 2254(d)(2) requires federal habeas courts to look at a state court's decision "in light of the evidence presented in the State court proceedings," whereas § 2254(d)(1) does not. Yet *Pinholster* held that § 2254(d)(1) barred an evidentiary hearing, despite lacking the clarifying language found in § 2254(d)(2), which implicitly makes clear that an evidentiary hearing is inappropriate for § 2254(d)(2) claims, too. *See, e.g.*, *Pinholster*, 131 S. Ct. at 1400 n.7; *Blue v. Thaler*, 665 F.3d 647, 656 n.26 (5th Cir. 2011); *Rountree v. Balicki*, 640 F.3d 530, 538 (3d Cir. 2011) ("Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication."), *cert. denied*, 132 S. Ct. 533 (2011).

hearing as it related to various juror responses given during voir dire. (Doc. # 95 at 176.) The Alabama Court of Criminal Appeals disagreed, finding that Hammonds' Rule 32 counsel had adequate time. That court stated, "Hammonds was represented by two attorneys during the Rule 32 proceedings. One was appointed March 1, 2002, and had five months to prepare for the August 2, 2002, hearing; the second entered her notice of appearance on May 20, 2002, and had over two months to prepare for the August 2, 2002, hearing. . . . This was more than adequate to prepare for a Rule 32 evidentiary hearing." (Vol. 51, R. 83, at 7.) The state courts appear to have assumed that McClary could have prepared for the hearing while awaiting pro hac vice admission. This Court agrees.

The Court of Criminal Appeals also pointed out that Hammonds failed to call a single juror during the Rule 32 proceedings to substantiate his claims. (*Id.* at 12.) And he failed to present a single affidavit supporting his position. (*Id.*) Hammonds' inability to obtain funds for experts or to obtain additional discovery did not prevent him from subpoenaing jurors to testify. He knew the identities of the jurors and he had adequate information regarding their allegedly inaccurate voir dire responses when he drafted his Rule 32 petition. Not much preparation would have been required to subpoena the allegedly offending jurors. Accordingly, it is the finding of this Court that the failure to develop the record adequately on this point is due to Hammonds' lack of diligence. Therefore, *Michael Williams* does not require an evidentiary hearing, and the Court declines to have one.

In addition, because Hammonds bring this claim under § 2254(d)(1), the Court "is limited to the record that was before the state court that adjudicated the claim on the

merits." *Pinholster*, 131 S. Ct. at 1398. In other words, like with Claim B, *Pinholster* prohibits this Court from having an evidentiary hearing on Claim Q.

**E. The Merits**

Twelve claims remain for merits review. The claims that survived the exhaustion requirement, the procedural default doctrine, a motion to dismiss, and the State's abandonment arguments are: A, B, C, D, E, F, J, K, L, O, P, and Q. Each one presents a unique legal standard, so the Court will analyze each individually. For the sake of organization and clarity, the Court will also reiterate below which claims failed on procedural grounds.

**1. Claim A: Prosecutorial misconduct denied Hammonds his constitutional rights**

Doug Valeska, the District Attorney who prosecuted Hammonds, commented on both Hammonds' right to remain silent and Hammonds' incarceration for an unrelated offense. Both comments were decidedly improper. The question that concerns the Court, however, is whether the comments rendered the proceedings unconstitutionally unfair to Hammonds. Before delving into the legal issues, it is necessary to summarize the relevant facts.

The first improper comment by Valeska took place during the defense's cross-examination of Greg Gordon, Hammonds' co-worker. While asking Gordon about fingerprints lifted from the victim's telephone, the following exchange occurred:

> Q:      Let's say there's a phone next to the wall on the floor. You wouldn't have thought anything at all about sitting down and picking up that phone and putting [it on a nightstand], would you?
>
> A:      No.

> Q:          Mr. Hammonds would have done the same thing, wouldn't he?
>
> Valeska:    Objection. He can't testify—
>
> Court:      Sustained.
>
> Valeska:    —what Mr. Hammonds would do. Let him testify.

(Vol. 25 at 219.) The trial court immediately held a hearing outside of the jury's presence and determined that Valeska intended to refer to Hammonds when he said, "Let him testify."[16] Although the trial court found Valeska's statement improper, it still denied Hammonds' motion for a mistrial, finding that a curative instruction would suffice. Issuing its curative instruction, the trial court stated:

> Ladies and gentlemen of the jury, there was a statement made by the Prosecution, an objection by the Defense, which was sustained.  The remark, and I'm not sure in which manner it was intended, but it basically said, "Let him testify."  It can be taken several ways, but such remarks are improper, and the jury should disregard that remark by Mr. Valeska.  Statements of counsel as I told you are not any evidence in this case and should not be used by you or considered by you as evidence.  Under the law the Defendant has the privilege to testify in his own behalf or not.  He cannot be compelled to testify against himself, and that no presumption of guilt or innocence of any kind should be drawn from his failure to testify.

---

[16] In fact, because Valeska had made similar comments in past cases, *see, e.g.*, *Hammond v. State*, 776 So. 2d 884 (Ala. Crim. App. 1998) (finding reversible error during sentencing when Valeska commented on result of defendant's previous trial for same offense); *Jackson v. State*, 414 So. 2d 1014 (Ala. Crim. App. 1982) (noting Valeska's improper closing argument about defendant's failure to testify); *McNair v. State*, 653 So. 2d 320 (Ala. Crim. App. 1992) (disapproving of Valeska's inappropriate remarks about the victim and the defendant), the trial court granted Hammonds' motion in limine prohibiting Valeska from commenting at trial about Hammonds' decision to exercise his right not to testify.

(Vol. 25 at 228.)

Valeska also made improper comments during closing arguments, stating, "[Hammonds] couldn't keep his stories straight in prison." This statement, like his reference to Hammonds remaining silent, violated one of the trial court's orders, this one prohibiting Valeska from disclosing to the jury Hammonds' incarceration for another, unrelated crime. After Valeska's comment, Hammonds again moved for a mistrial, which the trial court denied. Instead, the court gave the following curative instruction:

> Ladies and gentlemen of the jury, I told you before and I will tell you again; you know what the lawyers say to you is not evidence. It is not to be considered by you as evidence. What they tell you and what they are doing is arguing their case to you. They are submitting what they believe the evidence to be. They are attempting to draw certain inferences; what they say is just to assist you. But, it is not to be considered by you as any evidence in this case. And, the only evidence that you are to consider would be the evidence that comes from this witness stand or any exhibits that were introduced and admitted into evidence. So, just keep that in mind, what the attorneys tell you is not evidence.

(Vol. 34 at 859.)

On direct appeal, Hammonds argued that the trial court's curative instructions did not suffice to remedy Valeska's improper statements. The Alabama Court of Criminal Appeals disagreed and affirmed the trial court's decision to deny a mistrial. *Hammonds*, 777 So. 2d at 763–67. The Alabama Supreme Court, in a divided opinion, agreed "that the trial judge corrected any harm by giving appropriate corrective instructions." *Ex parte Hammonds*, 777 So. 2d at 778. Even so, the state supreme court warned that "[t]his case presents a classic example . . . of prosecutorial conduct that could, in certain

circumstances, cause us to overturn a conviction." *Id.*

Well-established constitutional law makes clear that a prosecutor acts improperly by commenting during trial on a criminal defendant's constitutional right to remain silent. *Griffin v. California*, 380 U.S. 609, 615 (1965). A comment refers to a defendant's silence if it was manifestly intended as a remark on the defendant's failure to testify or if the statement would lead the jury naturally and necessarily to take the remark that way. *United States v. Thompson*, 422 F.3d 1285, 1299 (11th Cir. 2005). A court tasked with deciding a claim of allegedly improper prosecutorial comments must ask a single question: did the comments, in light of the entire judicial proceeding, render the trial fundamentally unfair? *See Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (1987) (en banc) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). A judge's curative instruction can remedy the effects of any improper comment and prevent the need for a new trial. *Id.* In fact, the Eleventh Circuit views curative instructions as presumptively effective. *See United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993) ("Few tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instructions.").

The Alabama Court of Criminal Appeals undertook the fundamental fairness analysis. *Hammonds*, 777 So. 2d at 765, 767 ("Because of the trial judge's complete and timely instruction, the error created by the prosecutor's improper remark was vitiated so as to render the error harmless. . . . The prompt and thorough action by the trial judge in issuing a curative instruction to the jury as soon as the argument was made created a

presumption against error."). The Alabama Supreme Court upheld the state appellate court's application of the test, albeit without much analysis of the issue. Hammonds thus bears the burden of showing that the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In other words, this Court will look at the state courts' decisions with a deferential eye, asking only if the state courts ignored or unreasonably applied canonical federal law or engaged in unreasonable fact finding in light of the evidence presented at trial.

Against this backdrop, Hammonds argues that the state courts unreasonably applied three Supreme Court cases—*Griffin v. California*, 380 U.S. 609 (1965); *Doyle v. Ohio*, 426 U.S. 610 (1976); and *Estelle v. Williams*, 425 U.S. 501 (1976)—to decide that Valeska's statements did not render his trial fundamentally unfair. The Court disagrees. None of the three decisions cited by Hammonds dealt with the effect of a judge's curative instruction on a prosecutor's improper comments. In fact, the trial judge in *Griffin* did the exact opposite of offering a curative instruction: he explicitly told the jurors they *could* use the defendant's silence to infer his guilt. 380 U.S. at 610. Similarly, in *Doyle*, the trial court erred by allowing the prosecutor to argue to the jury that the defendants' silence gave rise to an inference of guilt. 426 U.S. at 613–15.

Here, the trial judge by no means offered a perfect curative instruction. Instead of telling the jury that they could not use Hammonds' silence to infer his guilt, he instructed

jurors that they should draw neither an inference of guilt nor innocence from his silence. This is arguably incorrect because the jury was required to presume Hammonds' innocence until the point in time when the State had proven his guilt beyond a reasonable doubt. But other than this semantic flaw, Judge Anderson's instruction conveyed to the jury that they had to disregard Valeska's statement, that the statement was not evidence, and that Hammonds had a right not to testify. This brings Hammonds' claims far enough outside the purview of *Griffin* and *Doyle* that this Court cannot say that the trial court acted contrary to, or engaged in an unreasonable application of, clearly established federal law.

In *Estelle*, the Supreme Court held that a state could not compel an accused to stand trial before a jury while dressed in identifiable prison clothes. 425 U.S. at 503–05. From here, a general rule has emerged, holding that references to a criminal defendant's incarcerated status may impermissibly compromise the defendant's presumption of innocence. *See, e.g.*, *United States v. Villabona-Garnica*, 63 F.3d 1051, 1058 (11th Cir. 1995) (citing *Estelle*, 425 U.S. at 503–05). But Hammonds' case falls well outside of the reach of *Estelle* and its progeny. Indeed, Valeska made his comment about Hammonds' inability to "keep his story straight in prison" in passing. *Cf. United States v. Blasingame*, 2007 WL 708983, at *10 (March 9, 2007) (relying partly on brevity of improper comments in denying habeas relief). Hence, unlike in *Estelle*, where the state forced the defendant to wear prison garb, there was not a constant reminder—or even a repeat reference—to Hammonds' incarcerated status. Valeska's comments also did not refer to the reason for Hammonds' incarceration. And the trial court issued a curative instruction

like it did with Valeska's improper comment about Hammonds' silence. These differences arguably make *Estelle* inapplicable.

Furthermore, several Eleventh Circuit decisions make clear that a curative instruction can render harmless an improper comment. *See, e.g.*, *Hill v. Turpin*, 135 F.3d 1411, 1417 (11th Cir. 1998) (cataloging the instances in which the court has held a prosecutor's comment on silence harmless, including when "the improper reference was 'isolated' or 'unintentional' or promptly addressed by a curative instruction from the trial court"); *United States v. Williams*, 341 F. App'x 599, 601–02 (11th Cir. 2009) ("Assuming arguendo that the prosecutor's statements were improper, the error was rendered harmless by the court's curative instructions, and, in light of the instructions, there is nothing to suggests the jury improperly relied on the prosecutor's remarks.") Hammonds failed to present a single case showing that the state's findings about the sufficiency of the trial judge's curative instructions were constitutionally infirm. Rather, Hammonds restated basic principles about how a prosecutor must refrain from commenting on the defendant's silence and how such comments will sometimes amount to reversible error. This does do not suffice. Therefore, this Court cannot say that the various state courts reviewing Hammonds' prosecutorial misconduct claim acted contrary to, or engaged in an unreasonable application of, clearly established federal law. Because Hammonds has not carried his burden, the Court must deny Hammonds' request for habeas relief as to Claim A.

## 2. Claim B: Ineffective assistance of trial and appellate counsel denied Hammonds' his Sixth Amendment rights

As a threshold matter, the parties disagree about how the Court should analyze Hammonds' ineffective assistance of counsel claims. On the one hand, the State wants the various individual allegations of ineffective assistance chopped up and analyzed separately. On the other hand, Hammonds wants the Court to analyze the allegations of his lawyers' deficient performance by grouping them by the phase of the trial and appeals process, and he wants the Court to address the alleged conflicts of interest of his counsel separately.

The Court finds Hammonds' arguments on this point persuasive. Supreme Court precedent suggests a federal district court analyzing an ineffective assistance of counsel claim should look at the individual allegations of ineffective assistance and their cumulative effect. *See Terry Williams v. Taylor*, 529 U.S. 362, 398 (2000) (holding state supreme court's decision "was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"); *Strickland v. Washington*, 466 U.S. 668, 690 (1984) (concluding federal court must address ineffective assistance claim "in light of all the circumstances"). So the Court will proceed by first analyzing Hammonds' claims of ineffective assistance at the guilt/innocence phase of his trial followed by his claims related to the penalty phase. After that the Court will address the allegedly deficient performance of Hammonds' appellate counsel. Finally, the Court will look at his claim that conflicts of interest rendered trial counsel's performance ineffective.

In analyzing these claims, the Court will apply the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner claiming

60

ineffective assistance must show that counsel's performance fell below an objective standard of reasonableness, and that this breach prejudiced the defense. 466 U.S. at 687–88; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003). The first prong of *Strickland*'s performance-and-prejudice test measures objective reasonableness by the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. The second prong requires the petitioner to prove prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694). A reasonable probability of prejudice "is a probability sufficient to undermine confidence in the outcome." *Id.*

*Strickland*, moreover, noted that "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation . . . [but] simply to ensure that criminal defendants receive a fair trial." 466 U.S. at 689. Therefore, federal courts have to resist indulging the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," by presuming that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. It is only when "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," *id.* at 686, that courts should grant an ineffective assistance claim.

### a. Ineffective assistance of trial counsel during the guilt/innocence phase

Hammonds first cites his trial attorneys' failure to follow a number of leads as the

basis for an ineffective assistance claim. According to Hammonds, his trial lawyers failed to follow "several leads that could have uncovered the *actual* perpetrator(s) of the crime." (Doc. # 6 at ¶¶ 40–44.) Among these leads was a tip that a death row inmate in California had bragged about killing Ms. Mitchell; a statement in the Dothan Police Department's report identifying another possible suspect; and a number of witnesses who reportedly last saw the victim alive with an unidentified white male. (*Id.* at ¶¶ 41–43.) Hammonds argues that a reasonable attorney would have investigated and developed these leads to a greater degree than his did attorneys, Charles Decker and Kathleen Nemish, and that he suffered prejudice as a result.

Hammonds' defaulted on his claim about his attorneys failing to investigate a lead from a statement contained in the police report. This leaves Hammonds with two arguments. The first relates to a California death row inmate who supposedly took credit for killing Mitchell. The second is more general, focusing on Decker and Nemish's failure to investigate leads from witnesses who said they last saw Mitchell alive with an unidentified white male.

The Court finds these arguments without merit. Under *Stickland*, defense counsel only has to provide reasonably effective assistance. It does not require a criminal defense lawyer to exhaust every lead, no matter how implausible or unlikely to bear fruit. *See, e.g.*, *Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000) ("Counsel is not required to present every nonfrivolous defense"). This rule recognizes there is an opportunity cost to the decisions a defense lawyer makes: the time and money spent pursuing a speculative lead means diminishing the scarce resources available to defense

counsel and forgoing better ways to develop the case. Hence *Strickland* recognizes that defense lawyers stand in the best position to make these types of tradeoffs, and the Supreme Court provided them ample leeway to do so. Indeed, only when a defense lawyer commits errors "so serious as to deprive [a] defendant of a fair trial, a trial whose result is reliable," does he open his decisions up to second-guessing by a court. *Strickland*, 466 U.S. at 687.

Here, the police found at the crime scene Hammonds' sperm on a paper tissue, his spermatozoa on the victim, and his blood on the victim's bedroom door and baseboard. This discovery led the State to base its case on DNA evidence. And knowing that the prosecution would do so, defense counsel made a rational decision not to pursue a far-fetched alibi about a California inmate killing Mitchell, focusing instead on undermining the State's DNA evidence more directly. This is by no means an unreasonable decision.[17] *See, e.g.*, *Bell v. Cone,* 535 U.S. 685, 702 (2002) (stating "tactical decision about which competent lawyers might disagree" does not qualify as objectively unreasonable); *Brownlee v. Haley*, 306 F.3d 1043, 1061 (11th Cir. 2002) ("The attorneys' decision not to pursue Brownlee's alibi defense after deeming it implausible and unlikely to succeed is precisely the kind of strategic decision on which a court should defer to the judgment of counsel."); *Lashley v. Armontrout*, 957 F.2d 1495 (8th Cir. 1992) ("A defense attorney is not ineffective for not presenting an implausible theory of defense or mitigation."), *rev'd on other grounds*, 507 U.S. 272 (1993). So too with Nemish and Decker's failure to look

---

[17] In fact, a federal court has found a lawyer ineffective for presenting weak alibi evidence that had the effect of bolstering the prosecution's case. *See Henry v. Poole*, 409 F.3d 48, 66–67 (2d Cir. 2005).

into the unidentified white male that a number of witnesses say accompanied Mitchell shortly before her death. Given the DNA evidence found at the scene that linked Hammonds to the murder, along with Valerie Rivers' testimony that she saw Hammonds with a ring that matched the one taken from the victim, Nemish and Decker acted reasonably when they declined to pursue the lead.

Next, Hammonds argues that trial counsel failed to identify and investigate witnesses that would have given him an alibi. (Doc. # 6 at ¶¶ 51–59.) More specifically, Hammonds contends that trial counsel should have interviewed Charles King, David Preston, Tim Pridgen, Greg Gordon, Daryl White, Valerie Rivers,[18] and Jack Tate. Hammonds testified at his Rule 32 hearing that each one would have produced evidence that either undermined the State's theory of the case or would have established his alibi. After the hearing, the trial court rejected Hammonds' arguments, noting that Decker and Nemish represented Hammonds admirably under the circumstances and that Hammonds failed to introduce evidence proving otherwise. (Vol. 51, R. 82, at 6–8.)

After reviewing the record, this Court cannot say that defense counsel acted unreasonably by failing to interview the witnesses that Hammonds claims would have provided him with an alibi. Hammonds himself admits that trial counsel focused on undermining the DNA evidence. And this was a reasonable decision: the State had overwhelming evidence that not only established Hammonds' presence at the crime scene but also his guilt. Thus it made sense for trial counsel to train their focus on undermining

---

[18] As discussed above, Hammonds procedurally defaulted on this claim as it relates to Rivers, so the Court will not address it here.

the accuracy and reliability of that evidence instead of investigating what would have been a weak alibi defense. *Cf. Chandler*, 218 F.3d at 1319 ("Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."); *Brownlee*, 306 F.3d at 1061 ("The attorneys' decision not to pursue Brownlee's alibi defense after deeming it implausible and unlikely to succeed is precisely the kind of strategic decision on which a court should defer to the judgment of counsel.").

Moreover, courts generally view ineffective assistance claims with great caution when the only evidence of a missing witness's testimony comes from the defendant. *See, e.g.*, *Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985). Hammonds produced not a shred of evidence showing that he would have succeeded on his alibi defense or that the witnesses would have testified in the manner in which he claims. (*See* R. 83 at 24 ("Hammonds did not call any of these witnesses to testify at the evidentiary hearing or otherwise present any evidence indicating what they would have testified to had they been called to testify at Hammonds's trial.").) For example, Nemish testified during the Rule 32 hearing that she attempted to find the time cards that would have given Hammonds a plausible alibi, but her investigation revealed the cards had been destroyed. (Vol. 51, R. 83, at 19.) Hammonds failed to introduce the time cards at the hearing, which, if he had, would have suggested Nemish unreasonably failed to locate them. Nor did he call a witness to testify about when the time cards were destroyed so as to show that a reasonably timely investigation would have led to their discovery. Similarly, although Hammonds testified at the hearing that King and Preston would have verified his alibi, he called neither one to testify, nor did he have them submit an affidavit about what they

65

would have testified to if called during his trial. (*Id.* at 19–20.) Accordingly, Hammonds has not met his burden of showing that his trial counsel's failure to investigate and call witnesses "rendered his trial fundamentally unfair." *Coon v. United States*, 441 F.2d 279 (5th Cir. 1971), *cert. denied*, 404 U.S. 860 (1971).

Hammonds' next arguments rely on more general accusations: he contends that Nemish and Decker failed to formulate a sound defense strategy to rebut the State's case, and that they made numerous strategic errors before and during trial. (Doc. # 6 at ¶¶ 60–69.)[19] Hammonds focuses on how Decker and Nemish put on substantially less evidence than did the State. He also takes issue with what witnesses trial counsel did and did not call to testify. Along these same lines, Hammonds claims that trial counsel erred by failing to seek independent testing of the physical evidence linking Hammonds to the crime. (*Id.* at ¶ 70.) After the Rule 32 hearing, the trial court rejected these claims, finding that defense counsel undertook extensive work as it related to the DNA tests that eventually proved Hammonds' guilt. (Vol. 51, R. 82, at 5–6.)

This Court sees no reason to hold that these findings were contrary to, or an unreasonable application of, federal law. Hammonds provided no evidence contradicting the evidence relied upon by the state court. He also failed to provide Supreme Court precedent directly on point, and he declined to argue in his merits brief that the state courts unreasonably applied *Strickland*'s general rules as it relates to his claims.

More importantly, defense counsel consulted a number of experts about the State's

---

[19] Hammonds procedurally defaulted on the claim that trial counsel failed to contest the qualifications of the State's experts. Accordingly, the Court has not considered it here.

DNA testing procedures. Decker, for example, testified that he consulted with two DNA experts—one from a Maryland testing laboratory, the other a retired FBI agent. (Vol. 51, R. 83, at 19.) The experts told them that the State properly tested the material found at the scene; that the State obtained the correct results; and that retesting the material would only confirm the State's results. (*Id.*) As a result, Decker and Nemish smartly refrained from having those experts submit written reports of their findings, which would have been discoverable by the State, and relied instead on non-discoverable verbal reports. Furthermore, defense counsel has no duty to present the same volume of evidence as the prosecution. That Hammonds' lawyers had little favorable evidence to work with hardly makes their efforts unsatisfactory. Indeed, the overwhelming evidence of his guilt prejudiced Hammonds, not his attorneys' performance.[20]

Hammonds, in his next group of arguments, asserts that trial counsel rendered ineffective assistance by failing to object to prejudicial, non-probative evidence introduced by the State. (Doc. # 6 at ¶¶ 71–72.) The disputed evidence includes autopsy and crime scene photos, testimony about the victim's good character, evidence about

---

[20] Although a criminal defendant receives a presumption of innocence, this is not true of a habeas petitioner. *See Herrera v. Collins*, 506 U.S. 390, 399 (1993) ("Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears."); *Ross v. Moffitt*, 417 U.S. 600, 610 (1974) ("The purpose of the trial stage from the State's point of view is to convert a criminal defendant from a person presumed innocent to one found guilty beyond a reasonable doubt"). As a result, federal courts often rely on the overwhelming evidence of the defendant's guilt in rejecting ineffective assistance claims. *See, e.g.*, *United States v. Higgs*, 663 F.3d 726, 743 (4th Cir. 2011); *Mickey v. Ayers*, 606 F.3d 1223, 1240 (9th Cir. 2010) (". . . any deficiency in counsel's performance does not create a 'reasonable probability' that the 'result of the proceeding would have been different,' such that we lack confidence in the outcome of the trial, because the evidence of Mickey's guilt for premeditated murder was overwhelming.") (internal citations omitted); *United States v. Elgende*, 384 F. App'x 47, 52 (3d Cir. 2010) (". . . in light of the overwhelming case against Rosario and Elgende, they cannot demonstrate the necessary prejudice.").

allegedly stolen property, a recording left by the victim's mother on the victim's answering machine,[21] and testimony suggesting that Hammonds committed adultery. After the Rule 32 hearing, the state trial court rejected these claims. (Vol. 51, R. 82, at 750–51.) Once again, this Court sees no reason to upset that ruling. Hammonds did not submit evidence contradicting the evidence relied upon by the state court. Nor did he provide this Court with applicable Supreme Court precedent. And he again declined to argue in his merits brief that the state courts unreasonably applied *Strickland*'s general rules as they relates to these claims. Hammonds consequently cannot carry his burden to show the state courts acted contrary to, or unreasonably applied, federal law in denying his claim based on trial counsel's failure to object to certain pieces of evidence.

Hammonds also argues that trial counsel failed to ensure that he had a fair and impartial jury. (Doc. # 6 at ¶¶ 77–78.) To this end, he states that at least two jurors slept during his trial. (*Id.* at ¶ 78; Doc. # 95 at 92–93.) Further, he asserts that trial counsel rendered ineffective assistance by failing to question each juror individually, have the jury polled about one juror's cell phone usage, determine which prospective juror spoke with the victim's mother, and ensure that the juror questionnaires were included in the appeal record. (Doc. # 6 at ¶ 78.) The state circuit court disagreed, noting that neither Decker nor Nemish said they saw a juror sleeping. (Vol. 51, R. 82, at 6.) Judge Anderson noted that he did not see a sleeping juror either. (*Id.*) The court of criminal appeals addressed the remaining claims and, like the circuit court, rejected them. (Vol. 51, R. 83,

---

[21] Hammonds procedurally defaulted on this subclaim as discussed above.

at 21–22.)

The state courts did not act contrary to or unreasonably apply Supreme Court precedent in reaching these decisions. Generally speaking, a sleeping juror does not violate a defendant's due process rights absent a showing of prejudice and that he did not receive a fair trial. *See, e.g.*, *United States v. Fernandez-Hernandez*, 652 F.3d 56, 75 (1st Cir. 2011); *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000); *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987). Here, there is little evidence that jurors actually slept during the trial and, significantly, Hammonds failed to call either allegedly drowsy juror during the Rule 32 hearing. And even assuming that two jurors slept at some point during Hammonds' trial, there is no evidence that they did so during a part of the trial that presented testimony favorable to Hammonds. In fact, the overwhelming evidence of Hammonds' guilt makes it is far more likely that sleeping jurors prejudiced the *prosecution* and helped Hammonds. For example, if jurors slept while the State presented testimony about how Hammonds' DNA matched the DNA found at the scene, Hammonds arguably would have benefited. More importantly, the highly persuasive nature of the DNA evidence makes it unlikely that but for the sleeping jurors, the trial's outcome would have changed. Along these same lines, Hammonds produced no evidence to support his arguments about the jury's alleged lack of impartiality.

Finally, Hammonds argues that trial counsel failed to render effective assistance by declining to pursue meritorious motions. (Doc. # 6 at ¶¶ 82–83.) Specifically, Hammonds contends that trial counsel abandoned motions seeking "the appointment of additional counsel, extraordinary expenses for psychiatric assistance, permission to view

the crime scene with Mr. Hammonds, and an order prohibiting the prosecutor from referring to Hammonds by anything other than his given name." (*Id.* at 82.) The Alabama Court of Criminal Appeals found this argument meritless because Hammonds failed to produce evidence to support his claim. (Vol. 51, R. 83, at 28–29.) This Court agrees. Hammonds provided no case law or argument on this issue in his merits brief. Nor does his habeas petition cite to a Supreme Court case on point. Therefore, the state court's decision to deny relief was by no means contrary to, or an unreasonable application of, Supreme Court precedent.

### b. Ineffective assistance of trial counsel claims related to the penalty phase

Hammonds contends that trial counsel failed to investigate Hammonds' juvenile record and pursue youthful offender status.[22] (Doc. # 6 at ¶¶ 45–47.) According to Hammonds, trial counsel's failure to challenge statements in the probation officer's report as it related to the youthful offender evaluation amounted to ineffective assistance of counsel. (*Id.* at ¶ 46.) The Alabama Court of Criminal Appeals rejected Hammonds' ineffective assistance argument under this theory, concluding that he failed to present evidence supporting his assertions. (Vol. 51, R. 83, at 26–27, 29.)

Now, Hammonds cites to *Roper v. Simmons*, 543 U.S. 551 (2005), to support his claim that counsel rendered ineffective assistance by not pursuing youthful offender status. In *Roper*, the Court held that states could not execute anyone who commits a capital crime before his eighteenth birthday. In reaching this conclusion, the *Roper* Court

---

[22] Had the state trial court granted youthful offender status, Hammonds would have been ineligible for the death penalty. (*See* Doc. # 6 at ¶ 47.)

noted how people under 18 tend to lack maturity and have yet to develop fully a sense of responsibility. 543 U.S. at 569. *Roper*, however, did not deal with an ineffective assistance of counsel claim. Nor does it apply to offenders who are older than 18 at the time they committed the capital crime.

Moreover, because Hammonds has failed to put forward evidence about trial counsel's supposed ineffective assistance, he cannot satisfy *Strickland*'s test. For example, Hammonds contends that trial counsel's failure to contest the probation officer's report amounts to ineffective assistance. But he has not shown that the probation officer included inaccurate information in his report or that including new information would have swayed the trial court's decision. As a result, Hammonds cannot shoulder his burden of overcoming the presumptive reasonableness of his lawyer's decision to concede the accuracy of the probation officer's report. Nor can he show that, but for trial counsel's concession, there existed a reasonable probability that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Lastly, Hammonds contends that trial counsel failed to investigate and present compelling mitigating evidence about Hammonds' good character (Doc. # 6 at ¶¶ 84–87) and his troubled childhood (*id.* at ¶¶ 88–89). According to Hammonds, counsel only briefly elicited testimony from eight poorly prepared witnesses. (*Id.* at ¶¶ 85–86.) This, Hammonds says, left out a number of witnesses willing to testify on his behalf that would have painted a positive picture of his relationship with his two children, and "offer[ed] a

strong, positive, and caring picture of" his life.[23] (*Id.* at ¶¶ 86–87.) Similarly, Hammonds

contends that trial counsel failed to put forth testimony about Hammonds' unstable home

and his alcoholic, abusive father. (*Id.* at ¶¶ 88–89.)

 The Alabama Court of Criminal Appeals rejected these claims. (Vol. 51, R. 83, at

24–26.) In reaching this decision, the appeals court noted how Nemish testified at the

evidentiary hearing about what steps she took to prepare for the penalty phase. (*Id.* at 25.)

She said that she secured a mitigation specialist from the Alabama Prison Project to

investigate Hammonds' background, called Hammonds' mother to testify about his

abusive upbringing, and spoke with Hammonds' mother a number of times before trial to

ensure her fitness to speak on her son's behalf. (*Id.*) Conversely, Hammonds failed to

present evidence "that his counsel's investigation . . . was inadequate" and never showed

that "but for counsel's conduct in handling the penalty phase of his trial, he probably

would not have received the death sentence." (*Id.*)

 With the benefit of hindsight, Hammonds critiques trial counsel's preparation for

the penalty phase of his trial, claiming it fell below an objective standard of

reasonableness for a number of reasons. In evaluating these arguments, this Court "must

give great deference" to defense counsel's "choice of strategy and execution." *Collier v.

Turpin*, 177 F.3d 1184, 1198 (11th Cir. 1999) (citing *Strickland*, 466 U.S. at 689). In

other words, the Court will not address "what is prudent or appropriate, but only what is

constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (internal

---

[23] As discussed above, Hammonds defaulted on this sub-claim.

quotations omitted).

Applying these principles and the Supreme Court's decision in *Strickland*, the Eleventh Circuit granted the defendant habeas relief in *Collier v. Tuprin*, 177 F.3d 1184 (11th Cir. 1999). In so doing, the court of appeals first rejected the defendant's claim that his lawyer failed to investigate adequately when preparing his mitigation case. *Id.* at 1200. The court noted that defense counsel selected witnesses who "possessed much of the information about Collier's past and character that Collier now contends should have been presented to the jury." The same can be said of Hammonds' lawyers. Decker and Nemish had close relatives—including Hammonds' mother, wife, and aunt—testify on Hammonds behalf. More importantly, unlike the defendant in *Collier*, Hammonds never had his lawyers testify about their thought processes as they related to whom they selected to testify. Given the lack of evidence put forth by Hammonds, and the close fit between the facts here and those proving insufficient in *Collier*, this Court cannot say the state courts acted contrary to, or unreasonably applied, Supreme Court precedent in concluding that Hammonds' lawyers adequately investigated his mitigation case.

Hammonds' arguments about his lawyers' presentation to the jury and court are a closer question. In *Collier*, defense counsel elicited testimony about the defendant's good character, his reputation for truth, and how he worked hard to support his family. Yet Collier's lawyer did so by asking only surface level questions, thus presenting "no more than a hollow shell of the testimony necessary for a 'particularized consideration of relevant aspects of the character and record of [a] convicted defendant before the imposition upon him of a sentence of death.'" *Collier*, 177 F.3d at 1201–02 (quoting

*Woodson v. North Carolina*, 428 U.S. 280, 303 (1976)). What is more, Collier's lawyer,

knowing that the sentencing phase was of the utmost importance, agreed to have the jury

hear mitigation evidence at 8:00 p.m. on a Friday night after the jury had already

deliberated once and returned a guilty verdict. *Id.* at 1188. Collier's trial counsel then

proceeded to put on just an hour and a half of testimony before he rested around 9:30 p.m.

that night. *Id.* Most importantly, Collier's lawyer, during a post-trial evidentiary hearing,

*conceded* that his performance was deficient his client's sentencing. *Id.* at 1202.

Here, Hammonds presented no evidence at his Rule 32 hearing about what trial

counsel should have done to present his mitigation evidence more effectively. And unlike

the lawyer in *Collier*, Hammonds' attorneys defended their performance rather than

admitting to its inadequacy. The record further shows Hammonds' lawyers had Judge

Anderson instruct the jury on eight specific mitigating circumstances *in addition* to the

statutory mitigation factors. Specifically, the state circuit court instructed the jury:

> Number one, Artez Hammonds grew up in a destitute family
> where he was a disadvantaged child emotionally,
> economically, and socially.
>
> Number two, Artez Hammonds suffered from a father that
> was an alcoholic, from a father that brutalized, stabbed, and
> shot his mother, a father that hit him and berated him and in
> his presence abused his mother and subsequently committed
> suicide. That is the father.
>
> Number three, that Artez Hammonds grew up in a family that
> was dominated by an abusive alcoholic and as a result he was
> deprived of a meaningful role model and appropriate male
> influences.
>
> Number four, Artez Hammonds suffered from a mother that
> did not protect him from his abusive father and who was a

sickly and ineffective parent. That is referring to the mother.

Number five, that Artez Hammonds participated in and attended church regularly as a child and that he demonstrated a change in his life through the study of scriptures and conversion to Jehovah's Witness, that he has encouraged other inmates to study and improve their lives.

Number Six, that Artez Hammonds has been a prisoner that assisted correctional officers by securing their safety and has never caused any problems during his time in jail.

Number Seven, Artez Hammonds was a respectful and attentive student during the time that he was in school.

And number eight, Artez Hammonds was a loving father and a loving husband.

You must consider all the evidence offered in mitigation.

(Vol. 35, R. 47, at 1182–83.) Conversely, the ineffective attorney in *Collier* failed to elicit testimony that "was of a nature that could not reasonably have aided the jury in its sentence determination." 177 F.3d at 1201. The Eleventh Circuit even noted that Collier's lawyer "raced through the . . . witnesses, eliciting very little in the way of mitigating evidence from any of them." *Id.* at 1201 n.22. In Hammonds' case, the trial court's instructions to the jury show that Hammonds' lawyers did far better eliciting specific mitigation evidence than did the attorneys in *Collier*.

Moreover, "in evaluating the probability that [the defendant's] jury would have rejected the death penalty, [the court] must not forget to balance the aggravating and mitigating factors that would have been before the jury in the absence of his counsel's errors." *Collier*, 177 F.3d at 1203 (quoting *Strickland*, 466 U.S. at 695). The particularly brutal nature of Hammonds' murder of Marilyn Mitchell, its sexual nature, and

Hammonds' criminal history triggered three statutory aggravating factors favoring a death sentence. The applicability of these factors possibly, indeed likely, outweighed any mitigation evidence that defense counsel could have offered. So even assuming that Hammonds' counsel rendered ineffective assistance, he still did not suffer prejudice as a result. Admittedly, the Eleventh Circuit rejected a similar argument in *Collier*, but it did so partly because Collier's murder of a police officer while fleeing a robbery lacked careful planning and was not accompanied by "torture, *rape*, or kidnaping." 177 F.3d at 1203 (quoting *Jackson v. Herring*, 42 F.3d 1350, 1366 (11th Cir. 1995)) (emphasis added).

Here, Hammonds did not kill a similarly sized armed adversary in the heat of the moment. Rather, he raped and viciously stabbed to death a woman much smaller than he in a brutal, senseless, and planned act of violence. Under these facts, this Court cannot say that had counsel presented more mitigation evidence, or better prepared the witnesses that testified, there would have been a "reasonable probability that consideration of these facts would have led the jury to a different result." *Id.* (citing *Dobbs v. Turpin*, 142 F.3d 1383, 1390–91 (11th Cir. 1998)). Accordingly, Alabama's state courts neither acted contrary to, nor unreasonably applied, federal law in rejecting Hammonds' ineffective assistance of counsel claim.

### c. Ineffective assistance of appellate counsel

Hammonds contends that his appellate counsel, Charles Decker, rendered ineffective assistance. According to Hammonds, Decker's performance was deficient for failing to argue that the trial court erred in refusing to grant Hammonds' change of venue

and recusal motions, and by declining to argue that the trial court erred by questioning the

State's witnesses on DNA evidence. (Doc. # 95 at 128.) The Alabama Court of Criminal

Appeals rejected these arguments, however, holding that Hammonds presented no

evidence to support them. (Vol. 51, R. 83, at 29.)

Clearly established federal law requires appellate counsel to provide effective

assistance. *See, e.g.*, *Evitts v. Lucey*, 469 U.S. 387 (1985). In analyzing these claims, the

*Strickland* performance-and-prejudice test governs. *Clark v. Crosby*, 335 F.3d 1303, 1310

(11th Cir. 2003). As for the performance prong, prevailing professional norms for

appellate lawyers require them to argue all arguably meritorious issues. *See* American

Bar Association, *Guidelines for the Appointment & Performance of Defense Counsel in*

*Death Penalty Cases*, 10.5.1 (2003).[24]

Mr. Decker stood in the best position to weigh the merits of an argument before

submitting it to the state appellate courts. And the record suggests that this is exactly

what he did. Decker raised myriad issues related to the State's procedure for gaining and

testing Hammonds' DNA. *See Hammonds v. State*, 777 So. 2d 750 (Ala. Crim. App.

1999). He also put forth arguments related to Hammonds' change of venue motion, Judge

Anderson's impartiality, the trial court's closing instructions, and the propriety of

Hammonds' death sentence. That Decker chose to forgo some less meritorious arguments

---

[24] It is arguable that courts should even look to such a source for the standard governing an
ineffective assistance claim. As the *Strickland* Court noted, the purpose of the claim is to guarantee a
constitutional floor for representation in criminal adversarial proceedings, not to establish a set of best
practices for criminal litigation. 466 U.S. at 689 ("the purpose of the effective assistance guarantee of the
Sixth Amendment is not to improve the quality of legal representation . . . [but] simply to ensure that
criminal defendants receive a fair trial.").

does not mean that he provided ineffective assistance. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").  Courts have limited resources in which to deal with legal challenges, and the reality is that lawyers often best serve their clients by pressing their strongest arguments while foregoing other, less persuasive ones. Given the vast amount of discretion vested in Decker, the arguments he raised on appeal, and the lack of evidence submitted by Hammonds to prove that Decker acted unreasonably by foregoing certain arguments, this Court cannot say the state courts acted contrary to, or unreasonably applied, federal law when they rejected Hammonds' claims about Decker's supposed ineffectiveness on appeal.

### d. Hammonds' counsel's alleged conflicts of interest

Hammonds argues that his counsel suffered from two conflicts of interest. First, he claims that Alabama's compensation scheme for capital cases rendered trial counsel ineffective. (Doc. # 6 at ¶¶ 73–76, 79–80; Doc. # 95 at 114–16.) According to Hammonds, the compensation scheme imposed severe financial hardship on his attorneys, which, in turn, rendered them ineffective. The Alabama Court of Criminal Appeals rejected this argument. (Vol. 51, R. 83, at 17.) Second, Hammonds contends that Decker had a conflict with Diane Clayton, a potential witness, that rendered his assistance ineffective. (Doc. # 6 at ¶ 81; Doc. # 95 at 115.) The court of criminal appeals rejected this claim too. (Vol. 51, R. 83, at 29.)

On the claim related to Decker and Nemish's compensation, Hammonds argues

that the state court acted contrary to established Supreme Court precedent. For support, he cites primarily to *Cuyler v. Sullivan*, 446 U.S. 335 (1980), a case holding that if a defendant can show an actual conflict of interest adversely affected counsel's performance, courts must presume prejudice instead of requiring the defendant to prove it. 446 U.S. at 349–50. Proving the requisite "adverse effect" requires "a defendant . . . to demonstrate: (a) that the defense attorney could have pursued a plausible alternative strategy, (b) that this alternative strategy was reasonable, and (c) that the alternative strategy was not followed because it conflicted with the attorney's external loyalties." *Reynolds v. Chapman*, 253 F.3d 1337, 1343 (11th Cir. 2001). Hammonds claims that because Alabama law capped his out-of-court compensation at $1,000, *see* Ala. Code § 15-12-21 (1975), "trial counsel had a real financial incentive to devote an increasing portion of their time, energy, and resources to paying[] clients' cases." (Doc. # 95 at 121.)

But as the Alabama Court of Criminal Appeals noted, "Hammonds failed to plead any facts in his petition indicating, or to present any evidence at the evidentiary hearing regarding, what work he believed counsel failed to do as a result of their compensation or what more he believed should, or could have, been done with additional compensation." (Vol. 51, R. 83, at 17.) In addition, although both Decker and Nemish testified that they suffered financial hardship resulting from their representation of Hammonds, neither said that it gave rise to a conflict of interest. In fact, Nemish testified that she made Hammonds' case her first priority and that her compensation did not cause her to spend less time on it. (*Id.*) Under these facts, the Court cannot say that the appeals court acted contrary to established Supreme Court precedent when it found that neither Decker nor

Nemish had an actual conflict that caused them to give ineffective assistance to Hammonds.

On his claim about Decker's alleged personal conflict, Hammonds contends that Decker's alleged animus toward Diane Clayton led him to fail to pursue potentially exculpatory evidence. (Doc. # 95 at 124–25.) Again, Hammonds relies on *Cuyler* to support his claim, arguing the alleged conflict establishes that he suffered prejudice. The Court disagrees. Hammonds' evidence that Decker's supposed dislike of Clayton amounted to a conflict of interest is Decker's statement that he "did not see eye to eye" with Clayton. More importantly, *Cuyler* dealt with a defense lawyer's joint representation of co-defendants. In that situation, a lawyer's representation of one defendant necessarily creates a conflict as it relates to his representation of the other defendant. Because a joint representation is much different than the circumstances here—Decker had past dealings with and an ostensible personal dislike of Clayton, a non-client—Hammonds' case is easily distinguishable. The Alabama Courts of Criminal Appeals therefore did not act contrary to Supreme Court precedent when it denied Hammonds' ineffective assistance claim based on the ostensible conflict of interest.

### 3. Claim C: Trial court denied Hammonds the opportunity to litigate his post-conviction claims

In his habeas petition, Hammonds raises two claims related to his post-conviction appeal. First, he argues the trial court appointed a "useless" lawyer, Jack Blumenfeld, to represent Hammonds during his Rule 32 hearing. (Doc. # 6 at ¶¶ 93–96.) Second, Hammonds contends the trial court erred by denying the attorney that replaced

Blumenfeld adequate time to prepare for the Rule 32 hearing. (*Id.* ¶¶ 97–103.) The Court will address each argument individually.

### a. Sub-claim C.1: The trial court appointed useless counsel

The Alabama Court of Criminal Appeals found that state law barred this claim and, even if it did not, there is no right to counsel in post-conviction proceedings. (Vol. 51, R. 83, at 7–8.) This is a correct statement of federal constitutional law. *Coleman v. Thompson*, 501 U.S. 722, 753–54 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings."); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further."). While Hammonds tries to dress this claim up as an error committed by the state trial court, his complaint lies with Blumenfeld's performance, thus making it an ineffective assistance claim. The Rule 32 hearing was a collateral proceeding, however, meaning that he had no right to the effective assistance of counsel during it. *Mize v. Hall*, 532 F.3d 1184, 1192 n.5 (11th Cir. 2008) ("a convicted defendant has no constitutional right to effective assistance of counsel in collateral proceedings." (citing *Coleman*, 501 U.S. at 753–54; *Finley*, 481 U.S. at 555)). Accordingly, the state court of criminal appeals complied with federal law in denying sub-claim C.1.

### b. Sub-claim C.2: The trial court denied Hammonds' Rule 32 counsel time to prepare for the evidentiary hearing

The Alabama Court of Criminal Appeals rejected this argument too. (Vol. 51, R. 83, at 5–7.) In reaching this conclusion, the state appeals court observed that Hammonds filed his Rule 32 motion on February 20, 2002, and was appointed counsel about a week

later. (*Id.* at 5–6.) About two and a half months after that, his current lawyer, Tonya McClary, filed a notice of appearance and moved to have Hammonds' Rule 32 hearing moved from July 16, 2002, to a later date. (*Id.* at 6.) The circuit court granted this motion, moving the hearing date back until August 2, 2002, but denied two ensuing motions to push the date even further into the future. (*Id.*)

Hammonds contends that the trial court, by denying his motions for a continuance, deprived him of the opportunity to litigate his Rule 32 claims in a meaningful way. This argument hinges on McClary's assertion that she had little time to prepare for the hearing because the trial court did not admit her pro hace vice until July 16, 2002—just two and a half weeks before the hearing. (Doc. # 6 at ¶¶ 97–98.) But as the Alabama Court of Criminal Appeals noted, McClary filed an appearance well before that, which gave her over two months to prepare. (Vol. 51, R. 83, at 6–7.) The Constitution only requires that a defendant have a reasonable time to prepare, *see Hall v. Head*, 310 F.3d 683, 697–98 (11th Cir. 2002), and given the dearth of case law on the issue, the Court cannot say that the circuit court acted contrary to or unreasonably applied federal law in finding that two months sufficed.

### 4. Claim D: Hammonds' factual innocence

Hammonds still maintains his factual innocence. But as discussed above, *see supra* § IV.A.14, actual innocence "is not itself a constitutional claim" for relief. *Schlup v. Delo*, 513 U.S. 298, 315 (1995); *Herrera v. Collins*, 506 U.S. 390 (1993) ("actual innocence is not itself a constitutional claim"). And even if it was, Hammonds has failed to put forward new evidence establishing his innocence. Therefore, Hammonds' claimed

factual innocence does not provide him with grounds for habeas relief.

### 5. Claim E: Hammonds' motion for a change of venue

Hammonds claims that the trial court violated his constitutional rights by denying his motion for a change of venue based on presumed prejudice.[25] He also faults the state courts for viewing his claims based solely on presumed as opposed to actual prejudice, and he argues that he is entitled to relief on actual prejudice. As he must, Hammonds argues that the state courts that decided his claims acted contrary to, or unreasonably applied, Supreme Court precedent.

Hammonds' factual argument is straightforward. He contends the news media in Dothan, Alabama, produced such prejudicial coverage of Mitchell's murder in 1990, and of his arrest and trial years later, that he could not get an impartial jury or a fair trial. To buttress this argument, Hammonds points out how the *Dothan Eagle*—the area's most widely-read newspaper—often ran front page stories about Mitchell's murder alongside her picture. The stories sometimes contained gruesome details and inflammatory headlines. Hammonds also relates anecdotes from his former lawyers, detailing how Houston County residents told the lawyers how they prayed for them because they had to represent someone as obviously guilty of a heinous murder as Hammonds. According to Hammonds, similar sentiment ran throughout the Dothan community, and he believes that it denied him his rights to due process, a fair trial, and an impartial jury.

The Alabama Court of Criminal appeals disagreed. The appeals court reiterated

---

[25] Hammonds raised this claim on direct appeal and the Alabama Court of Criminal Appeals denied it on the merits. It is thus ripe for review by this Court.

that the trial court found the media coverage was at its most intense for the two weeks after the murder but quickly flamed out. Although Hammonds presented testimony from members of the media representing outlets in the Houston County area, the testimony revealed that the coverage did not contain particularly inflammatory or prejudicial commentary and kept mainly to reporting the facts surrounding Mitchell's murder. In addition, Hammonds presented evidence from a political science professor who conducted a survey of county residents. This survey showed that 72% of county residents knew something about the case; that the majority learned about the case through the news media; and, that if chosen as jurors, the majority would be uncertain as to Hammonds' guilt or innocence.

Hammonds, to support his claim that the Alabama courts acted contrary to or unreasonably applied federal law, cites to two Supreme Court cases—*Irvin v. Dowd*, 366 U.S. 717 (1961), and *Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Irvin*, the Supreme Court found clear and convincing evidence of a "build-up of prejudice" against the criminal defendant based on local news coverage. 366 U.S. at 725. The *Irvin* Court based this finding on evidence showing that 95% of households in the prosecuting county had heard extensive newscasts about the defendant's criminal record, parole violation, court martial, lineup identification, placement at the crime scene, and, most damningly, his confession to the six murders for which he was indicted. *Id.* at 725–26. The local newspaper also reported that the community fostered strong prejudices against Irvin and that "impartial jurors [were] hard to find." *Id.* at 725–27. Thus the voir dire showed a "pattern of deep and bitter prejudice" against Irvin, and eight of the twelve jurors

84

believed Irvin was guilty before the trial began. *Id.* at 727.

Although the *Irvin* Court reversed the conviction, it tried to stake out the limits of community prejudice as a basis for a mandatory change of venue for fair trial purposes. To this end, the Court wrote:

> It is not required . . . that jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722–23.

Here, the trial court correctly noted that qualified jurors need not come to the courthouse as blank slates wholly ignorant of the facts of the case. It further—and again correctly—stated that the defendant had to shoulder a heavy burden to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury. *Hammonds*, 777 So. 2d at 768. From there, and citing *Irvin* and Alabama law, the Alabama Court of Criminal Appeals stated that a defendant can have the venue changed where he "demonstrate[s] to the trial court that he cannot receive a fair and impartial trial in the county where he is to be tried." *Id.* at 769. The appeals court additionally listed the two instances where the law mandates a change of venue—when the media's coverage of the case so saturates the community that the trial setting is rendered "inherently suspect" and

where the defendant shows a connection between the publicity and the existence of actual prejudice. *Id.* In applying these rules to Hammonds' claim that he faced presumed prejudice because of an "inherently suspect venue," the appeals court affirmed the trial court's finding that "the pretrial reporting was factual and did not contain inflammatory or prejudicial commentary." *Id.* It also agreed with the trial court's decision "that the lengthy period between the murder and trial lessened the impact of any potentially inflammatory pretrial publicity." *Id.*

This decision was not contrary to or an unreasonable application of *Irvin*. Here, unlike in *Irvin*, the media covered the case less extensively, as evidenced by the lower percentage of people in Dothan who knew about it, and less prejudicially, as shown by the smaller percentage of Dothan citizens who held strong views about Hammonds' guilt. Perhaps most importantly, the news coverage did not contain reports of Hammonds' confession (because he didn't confess) whereas the local press in *Irvin* continually reported that the defendant had confessed to a string of gruesome murders. The Dothan press also appears to have refrained from running inflammatory or prejudicial commentary, which further weakens Hammonds' claims about prejudice. *See Heath v. Jones*, 941 F.2d 1126, 1135 (11th Cir. 1991) (holding that purely factual reporting will not support a change of venue claim). Furthermore, nothing in the record suggests that two-thirds of the empaneled jurors had a strong opinion about Hammonds' guilt, which brings this case farther outside of *Irvin*'s grasp. Because the factual differences between the two cases distinguish *Hammonds* from *Irvin*, Alabama's judiciary had ample room to find that prejudicial pretrial publicity did not impermissibly saturate the Dothan

community. This Court accordingly finds that the state courts neither acted contrary to nor unreasonably applied *Irvin*.

Next, Hammonds claims the Alabama courts ran afoul of *Rideau v. Louisiana*, 373 U.S. 723 (1963). In that case the defendant, Rideau, confessed to a bank robbery, a kidnapping, and the murder of a hostage. The confession was recorded and televised three times, and reached up to a third of the population in the parish where the crime occurred. Under these facts, the Supreme Court decided that Rideau's recorded confession, which took place during an interrogation by the parish's sheriff, amounted to a kangaroo court that deprived him of due process. *Rideau*, 373 U.S. at 726–27. Latching on to *Rideau*, Hammonds contends that the pretrial publicity in his case is indistinguishable and that any potential jurors exposed to it should be "disqualified from jury service no matter how earnestly he professes his impartiality." *See Mu'Min v. Virginia*, 500 U.S. 415, 441–42 (1991) (Marshall, J., dissenting).

This Court cannot agree. *Rideau* presented extreme facts and a rare type of prejudice—the broadcast of a taped confession—that would make juror impartiality almost, if not wholly, impossible. As discussed above, the Constitution does not guarantee criminal defendants the right to a jury composed of jurors as pure as driven snow. *See Meeks v. Moore*, 216 F.3d 951, 960 (11th Cir. 2000) (stating defendant is not "entitled to a change of venue whenever potential jurors have been exposed to the facts of the case."). Here, Hammonds has shown, at most, a high level of community interest and a somewhat intense amount of media coverage surrounding his trial. But he did not convince the state courts that this coverage infected the community with prejudice against

him. Nor has he shown that those same courts acted contrary to or engaged in an unreasonable application of federal law when making this determination. His venue claim is therefore due to be denied.

### 6. Claim F: The seizure of Hammonds' blood

As a general rule, preclusion does not bar the relitigation of questions of law on habeas corpus. *See, e.g.*, *Brown v. Allen*, 344 U.S. 443 (1953). This rule, however, has an exception: preclusion bars review of Fourth Amendment exclusionary rule claims. *Stone v. Powell*, 428 U.S. 465 (1976); *see also Cardwell v. Taylor*, 461 U.S. 571, 572–73 (1983) ("Federal courts [cannot], on a state prisoner's petition for a writ of habeas corpus, consider a claim that evidence obtained in violation of the Fourth Amendment should have been excluded at his trial, when the prisoner has had an opportunity for full and fair litigation of that claim in the state courts."); *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989). The *Stone* Court reasoned that, because the exclusionary rule seeks to deter unconstitutional police action, and since it has little to do with the accuracy of the fact-finding process, it would make little sense to allow a habeas petitioner to re-litigate such claims in federal court. Still, the exception barring collateral review of these claims by a federal court only applies "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim." *Id.* at 494.

Recognizing *Stone*'s applicability, Hammonds argues that he never had the opportunity to litigate his claim that the State violated his Fourth Amendment[26] rights by

---

[26] Hammonds tries to couch his claim as one sounding in the Due Process Clause rather than the Fourth Amendment's Search and Seizure Clause. (*See* Doc. # 95 at 196.) The vast majority of the cases he cites deal with the Fourth Amendment, however, so there is no getting around *Stone*'s applicability.

seizing his blood without probable cause.[27] The record belies this assertion. The Alabama

Court of Criminal Appeals quite clearly addressed Hammonds' Fourth Amendment

arguments, thoroughly reviewing and rejecting them after applying federal law. *See*

*Hammonds*, 777 So. 2d at 756–57. His claim based on the seizure of his blood is thus

barred by the rule set forth in *Stone*.

### 7. Claim G: The State's failure to provide a complete record

In his habeas petition, Hammonds contends that the Alabama courts violated his

right to meaningful appellate review by not providing a complete record. (Doc. # 6 at ¶¶

110–15.) As discussed above, *see supra*, § IV.A.2., the procedural default doctrine bars

the Court from hearing this claim.

### 8. Claim H: The State's violation of discovery orders

Hammonds' habeas petition claims that the state trial court denied him the right to

a fair trial by allowing the state to violate discovery orders. (Doc. # 6 at ¶¶ 116–19.) After

deciding that Hammonds cannot establish cause and prejudice, this Court found that the

procedural default doctrine prohibits reaching the merits of this claim. *See supra*, §

IV.A.3.

---

[27] Hammonds also contends the State waived its ability to rely on *Stone* by not raising the issue in the parties' Joint Report. This argument is unpersuasive. First, he relies on flawed authority, namely a non-binding district court case from outside this jurisdiction, *Reinert v. Larkin*, 211 F. Supp. 2d 589, 597 (E.D. Pa. 2002); a treatise, 2 James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 27.2 (3d ed. 1998); and an inapplicable Eleventh Circuit decision, *Towne v. Dugger*, 899 F.2d 1104, 1111 n.3 (11th Cir. 1990). In *Towne*, the Eleventh Circuit noted how the State never raised *Stone*'s rule in district court; it did not hold that the State waives its *Stone* argument by failing to mention it in the Joint Report or sometime before it has to file its merits brief responding to the petitioner's claims. And second, *Stone* makes clear that the inquiry turns on whether the petitioner had the opportunity to raise his Fourth Amendment claim in the State's courts, not what point in time the State raised the argument that *Stone* bars the petitioner's Fourth Amendment claim.

### 9. Claim I: The lack of funds to retain experts

Hammonds contends that a lack of funding compromised his efforts to mount a successful defense. (Doc. # 6 at ¶¶ 120–24.) As with the two claims discussed above, the procedural default doctrine bars the Court from hearing this claim. *See supra*, § IV.A.4.

## 10. Claim J: Failure to grant a mistrial after the prosecution mentioned Hammonds' silence

In his habeas petition, Hammonds reasserts his arguments as they relate to his request for a mistrial and the trial court's failure to sanction Valeska. (Doc. # 6 at ¶ 125.) At the end of the one sentence making up Claim J, he refers back to the section of his petition related to Valeska's misconduct at trial. Hammonds does not address Claim J in his merits brief either, and he cites no case law to support it as a standalone claim. As a result, this Court cannot find that the state courts acted contrary to or unreasonably applied federal law in refusing to grant Hammonds' request for a mistrial and for declining to sanction Valeska for his improper comments about Hammonds' decision not to testify.

## 11. Claim K: Failure to grant a mistrial after the prosecution mentioned Hammonds' incarceration

As with Claim J, Claim K does not present a standalone claim for relief. Hammonds' habeas petition once again refers back to the allegations related to Valeska's behavior, claiming that the trial court should have taken a different route than the one traveled at trial. (Doc. # 6 at ¶ 126.) Because Hammonds cites no case law to support his claim, and since he does not address the claim in his merits brief, the Court has no basis for finding that the state courts acted contrary to or unreasonably applied federal law

when deciding not to declare a mistrial or sanction Valeska for his improper comments about Hammonds' incarceration.

### 12. Claim L: The trial court admitted improper prejudicial evidence

Similar to Claims J and K, Hammonds' claim about the trial court admitting improper prejudicial evidence refers back to another part of his habeas petition. (Doc. # 6 at ¶ 127.) This time Hammonds makes reference to his ineffective assistance claim, arguing that the trial court erred by admitting "highly prejudicial, nonprobative evidence." (*Id.*) The Court deferred the procedural default analysis for this claim until now, because whether Hammonds could establish cause and prejudice turned on his ineffective assistance claim. *See supra*, § IV.A.5. Because this Court found that Hammonds' lawyers' failure to object to the disputed evidence did not amount to ineffective assistance, *see supra*, § IV.E.2.a, he did not establish the requisite cause and prejudice for failing to raise this claim for relief in state court. Therefore, Claim L is procedurally defaulted, and this Court is barred from ruling on the merits.

### 13. Claim M: The prosecution withheld evidence

Hammonds contends that the State failed to provide him with crucial exculpatory and impeachment evidence. (Doc. # 6 at ¶¶ 128–31.) Although Hammonds cites relevant case law to support his claim, *see, e.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972), the procedural default doctrine bars the Court from hearing it on the merits. *See supra*, § IV.A.6.

### 14. Claim N: Consideration of Hammonds' age

Hammonds argues that the trial court erred by failing to instruct the jury that it

must consider Hammonds' age at the time he committed the offense as a mitigating factor. (Doc. # 6 at ¶¶ 132–34.) However, the procedural default doctrine bars the Court from hearing this claim on the merits. *See supra*, § IV.A.7.

### 15. Claim O: Judge Anderson's refusal to recuse

In his next claim for relief, Hammonds argues the trial court judge should have recused himself. (Doc. # 6 at ¶¶ 135–39.) According to Hammonds, the judge's former job as a city attorney gave him access to specific details related to Mitchell's murder and the attendant investigation. What is more, Hammonds argues, the trial judge had existing friendships with investigators that gave him a personal interest in the case's outcome. Hammonds properly raised these concerns on direct appeal, and the state appellate court handed down a decision on the merits.

The Alabama Court of Criminal Appeals decided there was "no reasonable basis for questioning the trial judge's impartiality." *Hammonds v. State*, 777 So. 2d 750, 774–75 (Ala. Crim. App. 1999). So the appeals court held that Hammonds failed to carry his burden of proving the trial judge erred by declining to recuse himself. *Id.* at 775. The court of criminal appeals stated:

> Hammonds's evidence of bias or prejudice is mere supposition based on nothing more than the fact that the trial judge was acquainted with Dothan police officers. It should be noted that, while the trial judge may have known some of the police officers who were investigating this murder, and while he may have represented the Dothan Police Department in unrelated litigation when he was the Dothan City Attorney, the trial judge specifically denied ever having assisted the police in their investigation. According to the trial judge, he never advised, either formally or informally, any police officer about any aspect of the investigation. He never visited

the crime scene, nor did he view any of the evidence or speak
to family members. In short, his role as city attorney did not
involve the trial judge in any aspect of the police department's
criminal investigations during the time of this murder
investigation. (R. Vol.11, pp. 110–11.) Any appearance of
bias or prejudice caused by the trial judge's friendship with
police officers is certainly offset by the trial judge's friendship
with the defense counsel.

*Id.*

Hammonds takes issue with these findings on two grounds. First, he claims the
appeals court made its findings based on an unreasonable determination of the facts in
light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). According to Hammonds,
the record strongly suggests that Judge Anderson had greater knowledge about the case
and stronger relationships with prosecution witnesses than the Alabama Court of
Criminal Appeals let on. Second, he contends the state court acted contrary to, or
engaged in an unreasonable application of, federal law, *id.* § 2254(d)(1), by finding that
Judge Anderson had no duty to recuse. On this second point, Hammonds relies heavily on
*In re Murchison*, 349 U.S. 133 (1955), a case dealing with judicial recusal. The Court
will address each contention in turn.

### a. The Alabama Court of Criminal Appeals' factual determinations

A federal habeas court must presume the correctness of the state courts' factual
determinations. § 2254(e)(1). Hammonds can rebut this presumption, but only upon a
showing of clear and convincing evidence. § 2254(e)(1). In his attempt to make such a
showing, Hammonds claims that Judge Anderson's admission about having
conversations about the case with his staff and three members of the Dothan Police

Department means the Alabama Court of Criminal Appeals made an objectively unreasonable determination in concluding that Hammonds' claim of bias amounted to "mere supposition based on nothing more than the fact that the trial judge was acquainted with Dothan police officers." (Doc. # 95 at 141–42 (citing *Hammonds v. State*, 777 So. 2d 750, 775 (Ala. Crim. App. 1999)).)

But as the above-excerpted portion of the opinion shows, the criminal appeals court based its conclusion on ample evidence. It noted that Judge Anderson never represented Dothan in a manner related to Hammonds' case and he never advised the city on any issues related to it. Nor did he visit the crime scene, view any evidence, or speak with any family members. The evidence Hammonds relies on is based largely on Judge Anderson's associations with various Dothan police officers who worked on Hammonds' case. However, his relationships with those officers mostly dealt with representing Dothan in civil matters, such as inmate lawsuits and disciplinary actions against city employees. Given these facts, this Court cannot say that the Alabama Court of Criminal Appeals acted unreasonably in making its factual determinations as they related to Hammonds' recusal claim.

### b. The state courts' application of clearly established federal law

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Yet, as the Supreme Court has noted, "most matters relating to judicial disqualification [do] not rise to a constitutional level." *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948). At common law, a trial court judge only had to recuse himself upon having "a direct, personal, substantial, pecuniary interest in reaching

a conclusion against" a party to the case. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); *see also Aetana Life Ins. Co. v. Lavoie*, 475 U.S. 813, 824 (1986) (requiring recusal when judge's decision in a related case "had the clear and immediate effect of enhancing both the legal status and settlement value of his own case"). The *Tumey* Court adopted this common law rule—that a judge cannot hear a case in which he has a direct financial interest—as a constitutional due process requirement. In so doing, the Court limited the rule, stating that "matters of kinship, personal bias, state policy, [and] remoteness of interest, would seem generally to be matters merely of legislative discretion." *Id.*

Due process also requires recusal where the judge has a direct conflict arising from his participation in an earlier, related proceeding. *In re Murchison*, 349 U.S. 133 (1955); *Taylor v. Hayes*, 418 U.S. 488 (1974); *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971); *Unger v. Sarafite*, 376 U.S. 575 (1964). In *Murchison*, the case upon which Hammonds primarily relies, the judge questioned two witnesses in an initial proceeding to determine whether criminal charges should be brought. In other words, he acted as a "one-man grand jury." One of the witnesses answered the questions, but the judge found him untruthful and charged him with perjury; the other declined to answer, so the judge held him in contempt. He then tried and convicted both men in a second proceeding.

Under these facts, the *Murchison* Court set aside the convictions of the two men, citing the hoary principle that "no man can be a judge in his own case," and adding that "no man is permitted to try cases where he has an interest in the outcome." *Id.* at 136. But just like how the *Tumey* Court elicited a number of limiting principles, so too did the *Murchison* Court. It achieved this by carefully dividing non-pecuniary interest recusal

cases into two categories. In the first category, which requires recusal, are cases where the trial judge is "more a part of the accusatory process," like the judge in *Murchison* who sat as a one-man grand jury.[28] *Id.* at 136. In the second category, which does not require recusal, are cases similar to typical contempt proceedings, like where the judge presiding over the matter in which the contempt occurred (for example a civil jury trial) also hears the contempt charges stemming from that conduct. *See id.* at 137. In making this categorical distinction, and holding the facts presented fell into the first category, the *Murchison* Court emphasized the judge's prior relationship with the defendant and the personal knowledge that he had developed before hearing the contempt proceeding.

This Court cannot say that the Alabama Court of Criminal Appeals acted contrary to *Murchison* or applied it unreasonably. Judge Anderson took no part in investigating Hammonds, interviewing witnesses, or coordinating legal action against him. Nor did his past attorney-client relationship as a civil lawyer for Dothan create the appearance of bias. Put simply, nothing in the record cited upsets the "presumption of honesty and integrity" vested in Judge Anderson and which extends to "those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *see also Republican Party of Minn. v. White*, 536 U.S. 765, 796 (2002) (Kennedy, J., concurring) ("We should not, even by inadvertence,

---

[28] Another such example is *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971). There the defendant launched into a profanity-laced verbal attacks against the trial court judge. When the defendant was charged with criminal contempt, the Supreme Court required recusal, stating the defendant "should be given a public trial before a judge other than the one reviled by the contemnor." *Id.* at 466; *see also Taylor v. Hayes*, 418 U.S. 488, 501 (1974) (holding judge "embroiled in a running controversy" with the defendant could not preside over that defendant's criminal contempt trial). The facts of this case are plainly distinguishable: there was no prior proceeding, Judge Anderson had no previous encounter with Hammonds, and there was no personal animosity between the two.

'impute to judges a lack of firmness, wisdom, or honor'" (quoting *Bridges v. California*, 314 U.S. 252, 273 (1941))). Moreover, because Judge Anderson never presided over an earlier case involving Hammonds, and since Hammonds' case did not involve criminal contempt, this case is readily distinguishable from *Murchison*. Accordingly, Hammonds' claim based on Judge Anderson's decision not to recuse himself is due to be denied.

### 16. Claim P: Certain jurors considered extraneous evidence

In his habeas petition, Hammonds claims that certain jurors improperly considered extraneous evidence during deliberations. (Doc. # 6 at ¶¶ 140–44.) First he cites juror Andrea Chavez, asserting that she used her cell phone to call her husband while sequestered. Next he cites jurors Michael Hall and Sherron Farmer, arguing they violated his rights and the trial court's orders by talking about his case during breaks in trial.

The Alabama Court of Criminal Appeals rejected these arguments. In so doing, the court focused on how Hammonds "presented no evidence whatsoever at the evidentiary hearing to support these claims; he called no jurors to testify, nor did he introduce any affidavits from jurors." (Vol. 51, R. 83, at 12.) Hammonds declined to address the state court's decision in his merits brief, and failed to submit any evidence showing that the jurors did what he claims. And even assuming the jurors acted improperly, Hammonds does not argue that he suffered prejudice. Still, the Court will address his claim by asking whether the state court acted contrary to or unreasonably applied federal law.

The Supreme Court has held that deliberating jurors cannot consider evidence other than that submitted at trial. *See, e.g.*, *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965) (holding jury must base verdict on evidence coming "from the witness stand in a

public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."); *Remmer v. United States*, 347 U.S. 227, 229 (1954) ("[T]he integrity of jury proceedings must not be jeopardized by unauthorized invasions."); *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) ("The theory of our system is that the conclusions to be reached in a case will be induced only be evidence and argument in open court, and not by any outside influence, whether of private talk or public print."); *Mattox v. United States*, 146 U.S. 140, 149 (1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment."). Here, however, Hammonds has not produced evidence supporting his claim. Nor has he argued how the jurors' actions, if they did in fact occur, prejudiced him so as to make his conviction constitutionally infirm. His claim for relief on this ground is thus due to be denied.

### 17. Claim Q: Certain jurors provided inaccurate voir dire responses

Hammonds alleges that a number of jurors failed to respond accurately to voir dire questions, thereby depriving him of his right to an impartial jury. (Doc. # 6 at ¶¶ 145–49.) According to Hammonds, juror Don Jones failed to disclose that he knew four potential witnesses (*id.* at ¶ 146); two jurors, Jimmie Bryant and Vera Hayles, concealed that they knew Hammonds was in jail for an unrelated crime (*id.* at ¶ 147); and jurors Jimmie Bryant and Andrea Chavez never mentioned that they had family members who worked in law enforcement or had friends that did (*id.* at ¶ 148). The Alabama Court of Criminal Appeals denied Hammonds relief on these claims, because he "presented no evidence whatsoever at the evidentiary hearing to support [them]; he called no jurors to testify, nor

did he introduce any affidavits from jurors." (Vol. 51, R. 83, at 12.)

In light of the lack of evidence adduced by Hammonds on these claims, the Alabama Court of Criminal Appeals did not err by denying relief. Hammonds did not call Jones, Bryant, or Hayles to testify. Nor did he have them submit affidavits to his Rule 32 or habeas petitions. As a result, the state court of criminal appeals did not act contrary to or unreasonably apply federal law by denying Hammonds' request for relief.

### 18. Claim R: The trial court erred by denying his causal challenge of juror James Adkinson

Hammonds contends that, during jury selection, juror James Adkinson disclosed that he had a close relationship with the victim's father. (Doc. # 6 at ¶ 150.) According to Hammonds, this required Adkinson's dismissal for cause. (*Id.* at ¶ 151.) However, the procedural default doctrine bars the Court from hearing this claim. *See supra*, § IV.A.10.

### 19. Claim S: The trial court erred by refusing to remove certain jurors

In his habeas petition, Hammond claims the trial court should have refused to sit a number of jurors. (Doc. # 6 at ¶ 152–55.) But like with Claim R, the procedural default doctrine bars the Court from hearing this claim on the merits. *See supra*, § IV.A.11.

### 20. Claim T: The trial court exhibited unfair bias during the trial

In Claim T, Hammonds contends that Judge Anderson failed to act impartially during his trial. (Doc. # 6 at ¶ 156–64.) Because this claim is in procedural default, the Court must refrain from hearing it on the merits as well. *See supra*, § IV.A.12.

### 21. Claim U: Alabama's execution methods constitute cruel and unusual punishment

As with a number of claims discussed above, the procedural default doctrine bars

the Court from hearing this claim. *See supra*, § IV.A.13.

## V. CONCLUSION

For the reasons discussed above, it is hereby ORDERED that Artez Hammonds'

Amended Petition for a Writ of Habeas Corpus (Doc. # 6) is DENIED.

Done this the 27th day of March, 2012.

/s Mark E. Fuller
_____
UNITED STATES DISTRICT JUDGE
